UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

COURTE OREILLES LAKES ASSOCIATION INC.

    and,

LAC COURTE OREILLES BAND OF THE LAKE

    SUPERIOR CHIPPEWA,

        Plaintiffs,

      v.

ROSALIND C. ZAWISTOWSKI, as TRUSTEE of the

    ZAWISTOWSKI JOINT REVOCABLE TRUST.

        Defendant,

    and

RURAL MUTUAL INSURANCE COMPANY.

        Intervenor-Defendant.

Case No. 3:24-CV-128

---

**PLAINTIFFS' RESPONSE BRIEF IN OPPOSITION TO
THE TRUST'S MOTION FOR SUMMARY JUDGMENT**

---

Christa O. Westerberg, SBN 1040530
Tamara B. Packard, SBN 1023111
Samantha R. Foran, SBN 1122735
PINES BACH LLP
122 West Washington Ave., Ste. 900
Madison, WI 53703
(608) 251-0101 (telephone)
(608) 251-2883 (facsimile)
cwesterberg@pinesbach.com
tpackard@piensbach.com
sforan@pinesbach.com

Alf E. Sivertson (MN 122233)
LAW OFFICE OF SIVERTSON
AND BARRETTE, P.A.
1465 Arcade Street
Saint Paul, MN 55106-1740
(651) 778-0575 (telephone)
(651) 778-1149 (facsimile)
alf.sivertson@sivbar.com

*Attorneys for Plaintiffs*

1

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 4

SUMMARY JUDGMENT LEGAL STANDARD ...................................................... 5

STATEMENT OF FACTS ....................................................................................... 6

    A.      COLA and the LCO Tribe have a vital interest in the health of Lac Courte Oreilles, a unique Wisconsin lake. .............................................................. 7

    B.    Impairments to the Lake are caused by excessive phosphorus. ................... 8

    C.    The Trust's use of the Lake's water in its cranberry marsh operation pollutes the Lake. ......................................................................................... 10

REGULATORY BACKGROUND ........................................................................... 13

ARGUMENT ......................................................................................................... 15

    I.    The Trust's discharges of pollutants into the Lake violate the Clean Water Act. 15

        A.    The Clean Water Act must be construed consistent with its objectives to restore and maintain the Nation's waters. ....................................................... 17

        B.    The channels, ditches, and pipes discharging from Trust's marshes are point sources. ............................................................................................. 19

            1.    A "Point Source" is a physical structure. ............................................... 19

            2.    The Trust's ditches and channels from which it discharges phosphorus are "point sources." .................................................................. 22

        C.    The "irrigation return flow" exception does not apply ........................... 22

            1.    The phrase "return flows from irrigated agriculture" was not intended by Congress to apply to discharges from cranberry marshes and should not be applied here. .......................................................................... 23

            2.    The Trust's discharges are not "composed entirely" of return flows from irrigated agriculture. .................................................................. 30

        D.    Wisconsin Department of Natural Resources guidance has no bearing on the legal issue before the Court. ....................................................................... 34

        E.    United States Environmental Protection Agency guidance has no bearing on the legal issue before the Court. ..................................................... 37

    II.    The Trust's due process arguments are without merit ............................. 41

        A.    The due process argument is tied to a "permit shield" defense, which the Trust does not claim here. ............................................................................... 41

        B.    No due process defense to liability exists based on an agency's "public statements." ................................................................................................... 46

1.   County of Maui precludes Defendant's arguments that an agency's public statements can preclude liability, though agency action can be considered in the remedy phase. ................................................................. 47

2.   Defendant cites inapposite case law for its "agency statements" claim. 50

C.   The Trust's sub rosa laches argument is without merit. ........................... 51

CONCLUSION ......................................................................................................... 55

## INTRODUCTION

Defendant Rosalind C. Zawistowski, as Trustee of the Zawistowski Joint Revocable Trust ("Defendant" or "the Trust") moves for summary judgment claiming that its polluting discharges from its cranberry marsh operations are exempt from permitting requirements of the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* ("CWA" or "the Act"). Plaintiffs Courte Oreilles Lakes Association Inc. and the Lac Courte Oreilles Band of the Lake Superior Chippewa (together, "Plaintiffs") brought this citizen suit under the CWA to stop Defendant's unpermitted discharge of phosphorus into Lac Courte Oreilles (or "the Lake"), whose water quality has suffered due to pollution from excessive phosphorus.

The Trust claims its cranberry marsh water discharge points are not a point source of pollution for which a permit to discharge pollutants into Lac Courte Oreilles is required, arguing that since *some* of its discharges are a result of irrigating its cranberry crop, that *all* of its discharges can remain unregulated under the Clean Water Act's exception for "return flows from irrigated agriculture." This argument, if accepted, would create a massive loophole in the CWA and its objectives to restore and maintain the nation's waters. So would the Trust's argument that because regulatory agencies did not require it to obtain a permit, it would violate Defendant's due process rights to require one now— even if, as shown here, the agencies' interpretation of the law was wrong. The Court should reject Defendant's arguments and deny its motion for summary judgment.

4

## SUMMARY JUDGMENT LEGAL STANDARD

The Trust's description of the summary judgment standard at pages 10-11 of its brief[1] fairly states some of the basic and well-known principles regarding summary judgment. In this case, it is important for the Court to also be cognizant that Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary." *Modrowski v. Pigatto,* 712 F.3d 1166, 1168 (7th Cir. 2013). It is a "fundamental principle" that at the summary judgment stage, courts are not to weigh evidence, but rather "reasonable inferences should be drawn in favor of the nonmoving party." *Tolan v. Cotton*, 572 U.S. 650, 660 (2014).

The Trust does not claim that Plaintiffs cannot prove any of the five elements of their claim, and indeed has conceded facts supporting each of those elements, as discussed in the Argument section below. Rather, the basis of the Trust's motion is a claim that the "return flows from irrigated agriculture" exception to the definition of "point source" in the Act applies here, and therefore it is exempt from permitting requirements. (Def. Br. at 2, 11.) A defendant "carries the burden to demonstrate the applicability of a statutory exception to the CWA." *Pac. Coast Fed'n of Fishermen's Associations v. Glaser,* 945 F.3d 1076, 1083 (9th Cir. 2019).

---

[1] Formally, "Brief of Defendant Rosalind C. Zawistowski, as Trustee of the Zawistowski Joint Revocable Trust in Support of Motion for Summary Judgment," filed with the Court on June 13, 2024 as Document #26, and hereinafter referred to as "Def. Br."

Where a moving party seeks summary judgment based on a claim on which it bears the burden of proof, "it must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). "If the movant [fails] to make this initial showing, the court is obligated to deny the motion." *Id.*

## STATEMENT OF FACTS

There is a single substantive legal issue now before the Court: whether the Act's irrigated agricultural return flow exception, found at 33 U.S.C. § 1362(14) and 40 C.F.R. § 12.3(f), allows the Trust to discharge pollutants from its cranberry marsh operations into Lac Courte Oreilles without a permit and without violating the Act. The facts bearing on that question are essentially undisputed, and Plaintiffs refer the Court to a detailed treatment of the Defendant's Proposed Findings of Fact ("DPFOF") (Doc. 27) in Plaintiffs' Response to Defendant's Proposed Findings of Fact, filed herewith. Having said that, the Trust includes an extensive discussion in the "Facts" section of its brief about prior agency guidance that is argument. That argument will be addressed in the Argument section below. Further, Plaintiffs offer additional undisputed facts, supported by admissible evidence, that bear on the substantive legal issue presented as well as on the Trust's due process arguments. Those additional facts are detailed in

6

Plaintiffs' Proposed Additional Findings of Fact in Opposition to the Trust's

Motion for Summary Judgment ("PPFOF"), filed herewith.

For the Court's convenience, Plaintiffs summarize the facts of the issues

before the Court as follows:

**A. COLA and the LCO Tribe have a vital interest in the health of Lac Courte Oreilles, a unique Wisconsin lake.**

The Courte Oreilles Lakes Association Inc. ("COLA") was incorporated in

1994. PPFOF ¶ 1. COLA is a Qualified Lake Association that represents

approximately 650 property owners surrounding Lac Courte Oreilles and Little

Courte Oreilles. PPFOF ¶¶ 1, 2. Its Mission Statement, as stated on COLA's

website, is as follows:

> The purposes of the Courte Oreilles Lakes Association, Inc. (COLA) are (1) to protect, preserve and enhance the quality of the Courte Oreilles Lakes, their shorelands and surrounding areas, while respecting the interests of property owners and the rights of the general public, and (2) to consider, study, survey and respond to issues deemed relevant by the membership of the organization. The Courte Oreilles Lakes consist of Lac Courte Oreilles and Little Lac Courte Oreilles, both located in Sawyer County, Wisconsin.

PPFOF ¶¶1-3.

The Reservation of the Lac Courte Oreilles Band of Lake Superior

Chippewa Indians ("LCO Tribe") includes the eastern third of Lac Courte

Oreilles. PPFOF ¶ 4. The rest of the Lake lies within the Ceded Territories under

the Treaties of 1837 and 1842. PPFOF ¶ 4. Protecting the water quality of the Lake

is critical to protecting the LCO Tribe's rights under those treaties which include

the right to hunt, fish, gather, and for habitat protection. PPFOF ¶ 10-11. The

spiritual and physiological connections LCO represents to the people of the LCO Tribe are just as important as the quality of the habitat. PPFOF ¶¶12.

The Lake is a stratified two-story cold-water fishery lake. *See* Wis. Admin. Code § NR 102.06(7)(b)4. PPFOF ¶ 5. It is one of only five lakes in Wisconsin known to support resident populations of both cisco and whitefish, which require a specific combination of cold water and high oxygen levels to survive. PPFOF ¶¶ 7-8. Due to its highly sensitive and special character, the Lake is classified by the Wisconsin Department of Natural Resources ("DNR") as an Outstanding Resource Water, *see* Wis. Admin. Code § NR 102.10(1m)(1)17., a designation reserved for less than 1% of Wisconsin's 15,000 lakes and impoundments. PPFOF ¶ 5.

The DNR determined that in the case of the Lake, site-specific data and sound science showed that rather than using the general statewide phosphorus criterion of 15 parts per billion ("ppb") that applies to two-story fishery lakes, a different standard would be more appropriate. PPFOF ¶¶ 34-35. Therefore, earlier this year the DNR promulgated a new, lower site-specific criterion of 10 ppb for phosphorus in the Lake. PPFOF ¶¶ 35; *see also* Wis. Admin. Code § NR 102.06(7)(b)4.

**B.  Impairments to the Lake are caused by excessive phosphorus.**

Unfortunately, the Lake is not currently achieving the 10 ppb standard. Recent monitoring data show concentrations of 14-16 ppb of phosphorus in the Lake's west, central, and east basins. PPFOF ¶37.

Excess phosphorus negatively impacts water quality in the Lake. Phosphorus feeds the growth of algae, which consumes oxygen in the lake when algae die and decay. PPFOF ¶¶ 40-41. Consumption of oxygen reduces the oxythermal layer—the narrow band in the Lake at which water is both cold enough and oxygenated enough to support cisco and whitefish. PPFOF ¶ 41. Algae that have settled to the bottom of the lake releases phosphorus into lake sediments from dead or decaying algae cells, which further feeds algal production in the water. PPFOF ¶ 41. Thus, both current and historical sources of phosphorus contribute to existing impairments in the Lake. PPFOF ¶ 42.

The buildup of organic sediments from the decay of excessive algae and macrophyte growth is evident in Musky Bay, on the southwest side of the Lake, where it impacts the spawning areas for muskellunge—a prized game fish. PPFOF ¶¶ 43-44. When muskellunge, or "muskies," return to shallow spawning areas each spring to lay their eggs, the eggs land on the highly organic and low oxygenated sediment, which is not sufficient to support the eggs and any larvae. PPFOF ¶¶ 44-45. Phosphorus also contributes to increased algal mats in Musky Bay. PPFOF ¶ 46. Algal mats and excessive aquatic vegetation have in turn presented or negatively impacted boating, swimming, and fishing during open water months. PPFOF ¶ 46.

Phosphorus in Musky Bay also cycles to other parts of the lake, including the west, central, and eastern basins, as indicated by modeling. PPFOF ¶ 47. The levels of phosphorus in the Lake have thus impacted the attainment of the Lake's

9

beneficial uses, including a sustainable two-story fishery. PPFOF ¶48. The amount of phosphorus entering the Lake thus must be reduced to reduce the adverse impacts to the Lake, and phosphorus from cranberry bogs operating adjacent to the Lake are one such significant and controllable source. PPFOF ¶¶ 48, 51.

**C. The Trust's use of the Lake's water in its cranberry marsh operation polutes the Lake.**

The Trust uses water from the Lake's Musky Bay for multiple purposes: to flood its cranberry beds on the East Marsh and West Marsh for the fall harvest, for frost and freeze protection, for pest control, and to form a winter protective ice layer over the cranberry vines. PPFOF ¶ 21. These flooding events occur at different times of the year. PPFOF ¶ 23. In addition, the Trust sometimes uses the Lake's water for irrigation. DPFOF ¶ 13.

The Trust discharges the water from these flooding events to Musky Bay at the outlets from the canals and ditches on the East Marsh and West Marsh as depicted in the pictures in paragraphs 54 and 60 of the Complaint. PPFOF ¶¶ 18-19, 22. During discharge events, water is visibly flowing at the outlets of the East and West Marshes and contains debris such as cranberry vine leaves and other organic material and sediments. PPFOF ¶24. The water also contains phosphorus, which is applied to the cranberry crop as a fertilizer. PPFOF ¶25. Over the years, the water discharged from the East Marsh outlets has carved an underwater channel into Musky Bay. PPFOF ¶26. The Trust does not possess a

10

WPDES permit (discussed further below) for the discharge. PPFOF ¶ 53.

Of greatest concern is the phosphorus pollution to the Lake caused by these discharge events. The LCO Tribe's Conservation Department has collected thousands of water samples over the years during the spring, summer, and fall months at various monitoring points on Musky Bay to monitor water quality in the Bay. PPFOF ¶¶13-14. Lab results over the last five years of samples taken from near the Trust's East and West Marsh outlets show phosphorus concentrations in the samples ranging from 34 ppb to a high of 450 ppb. PPFOF ¶¶32-33. These concentrations are many times the current phosphorus criterion of 10 ppb established for the Lake by the DNR. PPFOF ¶¶35-36. Data on phosphorus concentrations from discharges from the Trust's (and its predecessor's) cranberry operation on Musky Bay goes back to 2000 and consistently shows high phosphorus concentrations in the water samples during discharge events. PPFOF ¶38.

In a 2006 public nuisance case brought against the Trust's predecessor, William Zawistowski, by the State of Wisconsin and 12 property owners on the Lake, the court found that Zawistowski's discharges of phosphorus pollutants from the East and West Marshes into Musky Bay have been continuous and done with full knowledge of the adverse consequences to the water quality of the Lake. Sivertson Dec., Ex. B: Findings of Fact, Conclusions of Law and Decision of Sawyer County Circuit Court Judge John P. Anderson, April 5, 2006. The court found that the discharges are through "distinct ditches" and that, "Each ditch or

canal is manmade and are connected to Musky Bay." The court found that these ditches and canals "now act as the point source for much of the phosphorus discharged into Musky Bay." Sivertson Dec., Ex. B, p. 3.

The court further found that the interference in use caused by the phosphorus discharges was "likely expanding in size and duration" and, if found to be a nuisance, would constitute a "substantial threat to the public health and safety" under Wisconsin's Right-to-Farm law. Sivertson Dec., Ex. B, p. 26, 35. Because of this, the court stated that Zawistowski "can no longer hide behind the veil of self-imposed ignorance to the effects his cranberry operation is having on Musky Bay," and if he continues "he does so at his own risk." Sivertson Dec., Ex. B, p. 36.

Since 2006, the DNR has included Musky Bay on the 2012 list of impaired waters for nuisance algal growth leading to loss of beneficial uses. PPFOF ¶ 49. The DNR has included the Lake on its 2018 list of impaired waters for low dissolved oxygen which directly impacts the Lake's fishery. PPFOF ¶ 50. Additional data supports listing the Lake as impaired due to phosphorus concentrations exceeding the newly promulgated phosphorus criterion of 10 ppb. PPFOF ¶ 37. These adverse effects on the water quality of the Lake are directly related to the discharge of water with high phosphorus concentration from the Trust's cranberry operation on Musky Bay. PPFOF ¶¶ 51-52.

In 2014, the Trust installed a tailwater recovery system on the East Marsh, a best management practice which recycles some of that marsh's water and

12

diverts it from the Lake. PPFOF ¶¶ 54-55, 58. Water quality improved in Musky Bay within two years of installation of the tailwater recovery system. PPFOF ¶ 59. The East Marsh still draws in and discharges some Lake water, however, and the West Marsh lacks any sort of tailwater recovery system. DPFOF ¶¶ 26, 28-29.

## REGULATORY BACKGROUND

Congress declared a clear purpose of the Federal Water Pollution Control Act, commonly known as the Clean Water Act: to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. To attain the goals set out in the CWA, the Administrator of the Environmental Protection Agency ("EPA") "shall, after careful investigation" work with other federal and state agencies to "prepare or develop comprehensive programs for preventing, reducing, or eliminating the pollution of the navigable waters." 33 U.S.C. § 1252(a). "The Act restructures federal regulation by insisting that a person wishing to discharge any pollution into navigable waters first obtain EPA's permission to do so." *Cty. of Maui, Hawaii v. Hawaii Wildlife Fund*, 590 U.S. 165, 170 (2020). Such permission can be secured through a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. § 1342. NPDES permits are issued by the EPA or by authorized states. 33 U.S.C. § 1342(b). Wisconsin is an authorized state, and the DNR may issue Water Pollutant Discharge Elimination System ("WPDES") permits. Wis. Stat. § 283.31.

A NPDES or WPDES permit is not a blank check to pollute. Rather, WPDES permits only allow discharges into surface waters that comply with effluent limits, set standards of performance for new sources, and establish effluent standards, prohibitions, and pretreatment standards. Wis. Stat. § 283.31(3)(a)-(c); *see also Domino v. Didion Ethanol, LLC*, 670 F. Supp. 2d 901, 913 (W.D. Wis. 2009) (noting permits issued under the WPDES program "use effluent limits to control discharges into navigable waters"). Additionally, the DNR may include conditions on a permit that will allow the discharge to comply with federal or state water quality standards, federal laws or other regulations, or other limits established through different planning processes. Wis. Stat. § 283.31(3)(d).

Some standards depend on a water's designated use, such as for fish and aquatic life, or for recreation. *See, e.g.*, Wis. Admin. Code § NR 102.04. For particularly high-quality waters, including outstanding resource waters such as the Lake, discharges may not lower the quality of the waters—a concept known as "anti-degradation." Wis. Admin. Code §§ NR 102.05(1)(a), .10(2). So, for example, if the maximum allowed concentration of phosphorus in a lake is 10 ppb, discharges will be limited so as to ensure that this standard is not exceeded in the lake.

The CWA allows for "citizen suits," in which any citizen may bring a civil action against "any person…who is alleged to be in violation" of the pollution standards set forth in the Act. 33 U.S.C. § 1365. This includes violations of

14

NPDES permits, or lack thereof. 33 U.S.C. § 1365(f); *Atl. States Legal Found., Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 818 (7th Cir. 1997) (citing cases). A plaintiff in a citizen suit must prove five elements: that defendant (1) discharged (2) a pollutant (3) to navigable waters (4) from (5) a point source. *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1142 (10th Cir. 2005), as corrected (Oct. 21, 2005). A defendant then "carries the burden to demonstrate the applicability of a statutory exception to the CWA." *Pac. Coast Fed'n of Fishermen's Associations v. Glaser*, 945 F.3d 1076, 1083 (9th Cir. 2019).

The CWA is a strict liability statute, and "[a]ll that is needed to establish a violation is proof that a point source polluter violated the terms and conditions of the [CWA], or a permit issued under the Act." *Domino*, 670 F. Supp. 2d at 913 (citing *Kelly v. EPA*, 203 F.3d 519, 522 (7th Cir. 2000); *Atlantic States Legal Found. v. Stroh Die Casting Co.*, 116 F.3d 814, 818 (7th Cir. 1997)). Remedies in a citizen suit include injunctive relief, civil penalties under 33 U.S.C. § 1319(d), and plaintiffs' costs of litigation. 33 U.S.C. § 1365(a), (d). Civil penalties are paid to the U.S. Treasury and may be reduced by a court based on factors such as the seriousness of the violation and good-faith efforts to comply. 33 U.S.C. § 1319(d).

## ARGUMENT

### I.   The Trust's discharges of pollutants into the Lake violate the Clean Water Act.

In its motion for summary judgment and answer to the complaint, the Trust does not challenge that Plaintiffs can prove all five elements of their claim.

Specifically, the Trust concedes and cannot (and does not) challenge that it is a "person"[2] (PPFOF ¶20) who (1) discharges (DPFOF ¶ 23 and Response) (2) phosphorus (DPFOF ¶ 23 and Response), (3) to the Lake (a water of the United States)[3] (PPFOF ¶ 6) (4) from (5) outlets including channels and culverts from its cranberry marshes (DPFOF ¶¶ 14, 27, 29 and Responses). Phosphorus is a known pollutant and regulated by the DNR as such. *See Upper Chattahoochee Riverkeeper Fund, Inc. v. City of Atlanta*, 953 F. Supp. 1541, 1545 (N.D. Ga. 1996) ("Phosphorus is one of the pollutants contained in the effluent discharged from the City's treatment plants into the Chattahoochee River and its tributaries."); *see also Upper Blackstone Water Pollution Abatement Dist. v. U.S. E.P.A.*, 690 F.3d 9, 11 (1st Cir. 2012); Wis. Admin. Code NR § 217.04.

The Trust seemingly contends that Plaintiffs cannot meet the fifth element of their claim – that the Trust's polluting discharges come from a "point source" – based on its claim that the discharges are excepted from that definition as return flows from irrigated agriculture. The Trust conflates the fifth element of Plaintiffs' claim with the statutory exception to the term "point source"—the application of which the Trust bears the burden of proof. The Trust's approach disregards the purpose of the CWA and is not supported by the text or

---

[2] The CWA applies to "any person," and defines "person" as "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 USC § 1362(5).

[3] A water of the United States is a "navigable water," for purposes of the CWA. 33 U.S.C. § 1362(7).

legislative history of the exception. On that basis alone, the Trust's Motion for

Summary Judgment should be denied.

### A. The Clean Water Act must be construed consistent with its objectives to restore and maintain the Nation's waters.

As noted above, the CWA's broad objective is to restore and maintain the

chemical, physical, and biological integrity of the Nation's waters. 33 U.S.C. §

1251. Courts have interpreted the statute consistent with achieving, and not

frustrating, these objectives.

Recently, in *County of Maui, Hawaii v. Hawaii Wildlife Fund*, environmental

organizations brought a CWA enforcement case against a municipal wastewater

reclamation facility for failing to obtain a permit for discharges of partially

treated sewage to the Pacific Ocean. 590 U.S. 165 (2020). The facility took the

position—supported by the U.S. Solicitor General—that because the discharged

sewage was pumped underground and passed through groundwater before

reaching the ocean, that the discharges were not "from" a point source. *Id*. at 172-

73. In other words, they argued that the CWA's permitting requirement did not

apply "if a pollutant, having emerged from a 'point source,' must travel through

any amount of groundwater" (which is not a point source) before reaching

navigable waters. *Id*. at 178.

The Court rejected this interpretation, first noting the statute's stated

purpose to "'restore and maintain the … integrity of the Nation's waters.'" *Id*. at

170 (quoting § 101(a), 86 Stat. 816). To that end, the Act "insist[s] that a person

wishing to discharge *any* pollution into navigable waters first obtain EPA's permission to do so." *Id.* (citing *EPA v. California ex rel. State Water Resources Control Bd.*, 426 U.S. 200, 203-205 (1976); *Milwaukee v. Illinois*, 451 U.S. 304, 310-11 (1981)) (original emphasis). It then noted the Act uses specific definitional language to achieve its objective, capped by a statutory provision that "broadly states that (with certain exceptions) 'the discharge of any pollutant by any person' 'without an appropriate permit' 'shall be unlawful'." *Id.* (citing § 301, 86 Stat. 844). The Court held that Maui's interpretation of the phrase "from navigable waters" was "too narrow, for it would risk serious interference with EPA's ability to regulate ordinary point source discharges." *Id.* at 178.

The Court was alert to interpretations that would frustrate the Act's purposes: "We do not see how Congress could have intended to create such a large and obvious loophole in one of the key regulatory innovations of the Clean Water Act," citing prior decisions where courts had rejected interpretations that would facilitate evasions of the law. *Id.* at 178-79 (citing *Calif. ex rel. State Water Resources Control Bd.*, 426 U.S. 200, 202-204 (1976), *The Emily*, 9 Wheat. 381, 390, 6 L.Ed. 116 (1924)).

Other courts have similarly observed that the CWA's definitions are written broadly to achieve its objectives, *Fox Bay Partners v. U.S. Corps of Engineers*, 831 F. Supp. 605, 608 (N.D. Ill. 1993) (noting that "most of the definitions in the CWA" are "broadly defined"), and that "[c]laims of exemption, from the jurisdiction or permitting requirements, of the CWA's broad pollution

prevention mandate must be narrowly construed to achieve the purposes of the CWA." *N. California River Watch v. City of Healdsburg*, 496 F.3d 993, 1001 (9th Cir. 2007).

The concept that the CWA must be construed to enforce its purpose is particularly applicable here, where Defendant seeks to apply an exception to itself—and virtually all agriculture production—from the Act's core permitting requirements.

### B. The channels, ditches, and pipes discharging from Trust's marshes are point sources.

The channels, ditches, and other outlets conveying phosphorus from Trust's Marshes to the Lake are point sources within the plain meaning and purpose of the CWA.

#### 1. A "Point Source" is a physical structure.

The CWA defines a "point source" as

> any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.

33 USC § 1362(14); *see also* 40 C.F.R. § 122.2. The statute goes on to read, "[t]his term does not include return flows from irrigated agriculture or agricultural stormwater runoff." 33 USC § 1362(14).[4] The CWA also states that the "[EPA]

---

[4] "Storm water" means storm water runoff, snow melt runoff, and surface runoff and drainage. 40 C.F.R. § 122.26(13).

Administrator shall not require a permit under this section for discharges **composed entirely of return flows from irrigated agriculture,** nor shall the Administrator directly or indirectly, require any State to require such a permit." 33 U.S.C. § 1342 (emphasis added).

"[T]he examples of 'point sources' listed by the Act include pipes, ditches, tunnels, and conduits, objects that do not themselves generate pollutants but merely transport them." *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians,* 541 U.S. 95, 105 (2004). Put differently, "the structure of the CWA's definition of 'point source' (a 'discernible, confined, and discrete conveyance ... from which pollutants are or may be discharged') connotes the terminal end of an artificial system for moving water, waste, or other materials." *Froebel v. Meyer*, 217 F.3d 928, 937 (7th Cir. 2000).

"The concept of point source was developed to distinguish pollution resulting from simple erosion over the surface of the ground from pollution that has been collected or comes from a confined system." *Friends of Sakonnet v. Dutra,* 738 F. Supp. 623, 630 (D.R.I. 1990) (footnote omitted). This was intentional, because when Congress created the NPDES permit system in 1972, it chose to regulate point source pollution through that system but not nonpoint source pollution. *Id*. at 630 & n.11 (quoting *Oregon Natural Resources Council v. United States Forest Service,* 834 F.2d 842, 849 (9th Cir.1987)). Nonpoint source pollution was instead primarily left to the states. *County of Maui, Hawaii*, 590 U.S. at 174-75. "'Point sources are subject to direct federal regulation and enforcement under the

Act. Nonpoint sources, because of their very nature are not regulated under the NPDES'." *Friends of Sakonnet*, 738 F. Supp. at 630.

As for Wisconsin's definition of point source, Defendant correctly observes that it is similar to the federal definition. Def. Br. at 9. However, Wisconsin's statute was not amended to except "return flows from irrigated agriculture" until 2017, as part of the biannual budget bill. *See* 2017 Wis. Act 59, § 1819m (amending Wis. Stat. § 283.01(12)(a)'s definition of "point source" to add, "This term does not include agricultural storm water discharges and return flows from irrigated agriculture."). The DNR's definition of "point source" in the administrative rule excludes any mention of return flows at all. Wis. Admin. Code § NR 205.03(27). Defendant presents no evidence that the EPA has approved the Legislature's alteration to Wisconsin's definition of "point source," as required by *see* 40 C.F.R. § 123.62,[5] and it is thus not enforceable as part of the State's program. *See Arkansas v. Oklahoma*, 503 U.S. 91, 110 (1992) (providing only "applicable" provisions of state law, i.e., those that have been approved by EPA, are federally enforceable).

---

[5] The EPA has approved the state's definition of point source as provided in the regulation, without the "irrigation return flow" language. *See* Memorandum from Candice Bauer, Chief, NPDES Permits Branch Section 2, Region 5, U.S. EPA, to File (Aug. 29, 2018), *available at* https://www.epa.gov/sites/default/files/2018-10/documents/wi_lar_issue_44_memo_to_file_final_0.pdf

2.  *The Trust's ditches and channels from which it discharges phosphorus are "point sources."*

By the Trust's own account, water from the East Marsh returns to Musky Bay "through the same **channel** used to draw water from the Bay." DPFOF ¶ 27. (emphasis added). Water initially drawn from Musky Bay into the West Marsh is later "conveyed by a culvert and released to a wetland on property owned by the Trust that is adjacent to Musky Bay." DPFOF ¶ 29; PPFOF ¶ 22. Plaintiffs have also demonstrated that water flows from the West Marsh through a ditch into Musky Bay. PPFOF ¶¶ 18-19. A "channel" and a "ditch" are each explicitly listed as point sources in the CWA, and a "culvert" is certainly also a method of "discernible, confined and discrete conveyance." 33 USC § 1362(14).

Therefore, under a plain reading of the statute, the channels and ditches transporting discharge to the Lake from the marshes are undoubtedly "point sources" which fall within the purview of the CWA and would thus require a WPDES permit. Plaintiffs have thereby met their burden. Assuming, *arguendo*, that the Court can read in the irrigation return flow exception into Wisconsin's definition of "point source," the only question to answer—which the Trust has the burden of proving-- is whether the Trust's discharges meet this exception. Simply put, it does not.

**C.  *The "irrigation return flow" exception does not apply.***

The "irrigation return flow" exception does not apply here, both because it was not intended to cover discharges from cranberry marshes, and also because

the Trust's discharges into the Lake are not composed entirely of water used for irrigation. The Court should reject the Defendant's interpretation, which would essentially exempt any agricultural discharge from the CWA's purview, contrary to the purpose of the statute discussed above. The Trust has not met its burden to show the exception to the WPDES permit requirement applies.

> 1. *The phrase "return flows from irrigated agriculture" was not intended by Congress to apply to discharges from cranberry marshes and should not be applied here.*

It is well settled that "the starting point for interpreting a statute is the language of the statute itself." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987). The phrase "return flows from irrigated agriculture" is used in two places in the Act: one (in the definition of "point source") that says "[t]his term does not include return flows from irrigated agriculture or agricultural stormwater runoff," 33 USC § 1362(14), and again in an exception to the NPDES permitting requirement, 33 U.S.C. § 1342 (providing the "[EPA] Administrator shall not require a permit under this section for discharges **composed entirely of return flows from irrigated agriculture,** nor shall the Administrator directly or indirectly, require any State to require such a permit.") (emphasis added).

There is thus inconsistency within the statute itself as to whether "return flows from irrigated agriculture" are not included within the definition of "point source," or whether they are included in the definition but are otherwise exempt from the CWA's permitting requirement. If the former, the phrase is anomalous

23

to the definition of "point source," which as described above is a *structure* from which discharge is emitted, because "return flows from irrigated agriculture" and its companion phrase "agricultural stormwater runoff" describe a *type* of discharge. If the latter, the phrase is anomalous to the purpose of the CWA to control pollution in order to restore and maintain the nation's waters. As the Trust acknowledges, the phrase "return flows from irrigated agriculture" is not defined in the CWA. Def. Br. at 11. The phrase "return flows from irrigated agriculture" has also not often been interpreted by the courts—and certainly not by any court in the Seventh Circuit.

The Trust turns to the dictionary to offer an interpretation of the phrase "irrigation return flows." Def. Br. at 11. In doing so, it broadly defines the term "agriculture" to mean essentially anything *having to do with* agriculture. From this, the Trust seemingly contends that any agricultural operation that sometimes uses waters of the United States to irrigate can claim the "irrigation return flow" exception to the CWA permitting requirement, even when the water discharged was not used for irrigation purposes. Def. Br. at 11-12. This interpretation does not correspond to the purpose of the CWA. Nor is it supported by the legislative history of the exception. *See County of Maui*, 590 U.S. at 176 (reviewing legislative history to interpret the CWA).

The CWA originally did not contain the irrigation return flow exception, or any exception, to the pollution permitting requirement. *See Glaser*, 945 F.3d at 1084–85 (citing *See Nw. Envtl. Def. Ctr. v. Brown*, 640 F.3d 1063, 1072 (9th Cir.

24

2011), *rev'd and remanded sub nom. Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597

(2013)). Rather, this exception was added in 1977, after the EPA's regulations

containing exceptions were struck down in *Natural Resources Defense Council, Inc.*

*v. Train*, 396 F. Supp. 1393 (D.D.C. 1975), aff'd sub nom. *Nat. Res. Def. Council, Inc.*

*v. Costle*, 568 F.2d 1369 (D.C. Cir. 1977), on the basis that EPA lacked authority to

create exceptions to the statute. *See* Andrew C. Hanson & David C. Bender,

*Irrigation Return Flow or Discrete Discharge? Why Water Pollution from Cranberry*

*Bogs Should Fall Within the Clean Water Act's NPDES Program*, 37 Envtl. L. 339,

350-51 (2007).

The EPA then promulgated new regulations that required permits for

polluting agricultural point sources, which was specifically defined to include

"irrigation return flow." *Id*. This phrase was noted to include "water used for

cranberry harvesting…and other such controlled application of water to land for

purposes of farm management." Hanson & Bender at 351 (quoting 41 Fed. Reg.

28, 493-28,496 (July 12, 1976)). Congress cut the promulgation of this rule short,

instead amending the CWA to add the irrigation return flow exception at issue

here. *Id.* Notably, while Congress's amendment borrows from the EPA's

language, the exception passed by Congress did not define "irrigation return

flow" and did not explicitly include cranberry harvesting in this term, as the

EPA's proposed regulations did. *Id.* This resulted in a gap, from which one can

infer that Congress intentionally left cranberry marshes out from those types of

agriculture that are exempt from NPDES permitting.

Moreover, Congress's addition of the irrigation return flow exception was simply intended to "correct[] what has been a discrimination against irrigated agriculture….Farmers in areas of the country which were blessed with adequate rainfall were not subject to permit requirements on their rainwater run-off, which in effect…contained the same pollutants." *Glaser*, 945 F.3d at 1084–85 (quoting 123 Cong. Rec. 39,210 (Dec. 15, 1977) (statement of Sen. Wallop)). The exception was intended to create equity between such farmers, establishing that those who needed to bring in water for irrigation due to climate would be treated as a "non-point source," and therefore exempt from permitting. Hanson & Bender, 37 Envtl. Law at 351-53. This was the sole purpose of the amendment—not to "exempt other types of agricultural point sources from the NPDES program, such as 'wet' crops like cranberry production or rice harvesting." *Id*. at 354.

These legislative facts played out in the primary case on which the Trust relies, *Pacific Coast Federation of Fishermen's Associations v. Glaser*, 945 F.3d 1076 (9th Cir. 2019). The Plaintiffs in *Glaser* brought a citizen suit against those in charge of "a tile drainage system that consists of a network of perforated drain laterals underlying farmlands in California's Central Valley that catch irrigated and water and direct it to surrounding waters." *Id*. at 1080. Essentially, the purpose of the tile drainage system was to provide a means through which water provided to agricultural land in California's Central Valley from rivers could be discharged. *Id*. The tile drainage system discharged pollutants, including selenium, into bodies of water. *Id*. at 1081.

26

The overall irrigation project of which the tile discharge systems were a part is the largest federal water management project in the country, spanning dozens of miles along the San Joaquin River. *Id*. These are the precise kinds of irrigated agriculture that the legislative history demonstrates Congress intended to exempt: large projects in an arid climate for crops that require irrigation, and that discharge from multiple locations. *Nw. Envtl. Def. Ctr. v. Brown*, 640 F.3d 1063, 1071–73 (9th Cir. 2011), *rev'd and remanded sub nom. Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 133 S. Ct. 1326, 185 L. Ed. 2d 447 (2013) (noting Congress's intent to alleviate EPA's burden in having to permit "every discrete source or conduit returning water to the streams from irrigated lands") (quoting 123 Cong. Rec. 38956 (Dec. 15, 1977) (statement of Rep. Roberts)).

Nonetheless, the Ninth Circuit concluded that the term "irrigated agriculture" as used in the CWA should be "defined broadly and include discharges from all activities related to crop production." *Glaser,* 945 F.3d at 1085. To reach its interpretation, the court used a dictionary to interpret the term "agriculture" and determined that the "term has a broad meaning that encompasses crop production." *Id.* at 1084. But the court also acknowledged the definition did not "resolve whether the discharges at issue here are exempt from the CWA's permitting requirement" and turned to legislative history. *Id.*[6] The

---

[6] The Trust did not mention the Court's analysis of the legislative history, and instead rested on the dictionary definition. Def. Br. at 12. While Plaintiffs maintain that the Ninth Circuit's interpretation should not be followed, it is important for the Court to consider not only the definition of the words of the statute, but also the context.

court reviewed the fact that the original form of the CWA did not contain any exceptions, as discussed above, and that it was amended in 1977 to provide an exception that would "promote[] equity of treatment among farmers who depend on rainfall to irrigate their crops and those who depend on surface irrigation which is returned to a stream in discreet conveyances." *Id.* (quoting 123 Cong. Rec. 26,702 (Aug. 4, 1977) (statement of Sen. Stafford)). According to the *Glaser* court, this supported the interpretation that "irrigated agriculture" is intended "to be defined broadly and include discharges from *all* activities related to crop production." *Id.* at 1085 (emphasis added).

Respectfully, this logical leap is not supported and should not be followed by this Court. It overlooks the objective of the CWA to restore and maintain the nation's waters and creates a loophole for virtually all agricultural discharge, contrary to the Supreme Court's more recent approach to CWA interpretation in *County of Maui*. It removes from the definition of "point source" a type of discharge, despite the fact that the ditches and channels which convey that discharge are clearly point sources. Indeed, some courts interpreting the parallel agricultural storm runoff exception and a similar exception for silviculture, *see* 40 C.F.R. § 122.3(e), have only applied it when such runoff is unchannelized, but have still required permits when the runoff is confined to and discharged from pipes, ditches, channels, and other point sources. *See, e.g., Olympic Forest Coal. v. Coast Seafoods Co.*, 884 F.3d 901, 908 (9th Cir. 2018); *NW. Envtl. Def. Ctr. v. Decker*, 728 F.3d 1085, 1085-86 (Mem) (9th Cir. 2013); *N. Carolina Shellfish Growers Ass'n v.*

*Holly Ridge Assocs., LLC.*, 278 F. Supp. 2d 654, 681 (E.D.N.C. 2003); *see also Miccosukee Tribe of Indians*, 541 U.S. at 106 ("§ 1314(f)(2)(F) does not explicitly exempt nonpoint pollution sources from the NPDES program if they also fall within the 'point source' definition").

The Ninth Circuit's interpretation also goes far beyond what is needed to level the playing field between agricultural producers who can rely on rainfall for their crops (and whose comparable discharges would normally be nonpoint agricultural stormwater runoff) and producers in arid climates (who are more reliant on irrigation). It does so by exempting *all* discharges from *any* kind of agricultural activities that receive any irrigation whatsoever. Yet agricultural stormwater runoff is exempt from liability based on the understanding that that Congress did not wish to impose liability for "agriculture-related discharges triggered not by negligence or malfeasance, but by the weather." *Waterkeeper All., Inc. v. U.S. EPA*, 399 F.3d 486, 507 (2ⁿᵈ Cir. 2005). Return flows for irrigated agriculture should only be excepted by the CWA to the same extent agricultural stormwater runoff would be—for excess water attributable to watering crops, whether by rainfall or irrigation.

Because the Ninth Circuit's opinion in *Glaser* was focused on a large irrigation project in an arid climate, it at a minimum should be limited to its facts. The Ninth Circuit's interpretation did not consider the legislative history showing that Congress excluded cranberry production from the definition of "irrigation return flows"—despite borrowing language from previously-

29

promulgated EPA regulations that did include cranberries in this phrase. *See* Hanson & Bender at 351. The court's reasoning is a poor fit for this case, involving a sole defendant with two cranberry marshes with only four discrete channels and ditches, PPFOF ¶¶18-19, which are "point sources" by any understanding of that term. Similarly, the Defendant's non-irrigation discharges (such as for harvest or frost-protection) were not caused by the weather, but by its intentional discharge of phosphorus-laden water to a lake that, increasingly, cannot tolerate it.

Defendant does not meet its burden to show its polluting discharges qualify for the CWA's "irrigation return flow" exception to the "point source" definition or excuse it from the requirement to obtain a WPDES permit by virtue of sometimes discharging irrigation return flows.

2.    *The Trust's discharges are not "composed entirely" of return flows from irrigated agriculture.*

Even if the CWA's irrigation return flow exception can generally allow unpermitted point source discharges from cranberry marshes, the Court should still reject Defendant's claim to that exception under the facts of this case.

As noted above, 33 U.S.C. § 1342 excepts from the CWA's permitting requirement "discharges **composed entirely of return flows from irrigated agriculture**." 33 U.S.C. § 1342 (emphasis added). The Ninth Circuit in *Glaser* cited the dictionary for the definition of "entirely," which was "'wholly, completely, fully'." 945 F.3d at 1085. Joining the term "entirely" with "of return flows from

irrigated agriculture," one would think the statute would allow unpermitted discharges resulting only from irrigation of agriculture, not other kinds of discharge. However, the *Glaser* court went much farther than this, using its earlier analysis to apply the term "entirely" to "the many activities related to crop production." *Id*. While it appropriately construed "entirely" as a limiting factor intended to constrain exceptions to the CWA, the court's application of that term to *any* agricultural activity from a facility that also sometimes conducted irrigation obliterated the court's attempt at conservatism.

This Court should apply the statutory language as it is written, and consistent with the CWA's purpose, by only exempting discharges that are "composed entirely of return flows" of irrigation water. This interpretation avoids creating a massive loophole for any type of agricultural discharge to navigable waters, which clearly is not conveyed by Congress's more narrow language. It is also just the kind of loophole the supreme court warned against in *County of Maui*, which by expanding the types of discharges allowed without a permit would undermine the purpose of the Act to restore and maintain the nation's waters.

Plaintiff's interpretation is also supported by parallel language found in the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq*. *See USA Gymnastics v. Liberty Ins. Underwriters, Inc.*, 27 F.4th 499, 515 (7th Cir. 2022) (discussing "[t]he related-statutes canon--that related legislative enactments are *in pari materia*, and so should be interpreted harmoniously")

(citations omitted). The goal of RCRA is to "promote the protection of health and the environment and to conserve valuable material and energy resources" by, among other actions, assisting states and local governments with solid waste management. 42 U.S.C.A. § 6902.

In defining "solid waste," RCRA includes "solid, liquid, semisolid, or contained gaseous material resulting from…agricultural operations," but explicitly excludes "solid or dissolved materials **in irrigation return flows** or industrial discharges **which are point sources subject to permits** under [the CWA]." 42 U.S.C.A. § 6903(27) (emphasis added). This indicates Congress's understanding that not all irrigation return flows are excepted from the NPDES permitting requirement, and certainly that not all agricultural discharges are excepted. In other words, Congress would not have carved out polluted irrigation return flows from RCRA's mandates if it thought these discharges could not be regulated by NPDES permits. Courts have confirmed that "a substance cannot satisfy both the RCRA's definition of 'solid waste' and qualify as a 'point source discharge' under the CWA." *Charleston Waterkeeper v. Frontier Logistics, L.P.*, 488 F. Supp. 3d 240, 259 (D.S.C. 2020). Read together, the language of the CWA and RCRA show that Trust's discharges must be regulated through a WPDES permit here.

Defendant also cites *Fisherman Against Destruction of Environment, Inc. v. Closter Farms, Inc.*, 300 F.3d 1294 (11th Cir. 2002), where the court determined that discharges of accumulated rainwater, groundwater and seepage from a

sugarcane operation satisfied the irrigation return flow exception. However, this decision is "of limited use in determining whether cranberry bogs may be included with the irrigation return flow exemption." Hanson & Bender, 37 Envtl. Law at 356. This is because unlike sugarcane fields, "cranberry bogs use water for more than just irrigation. They use it for frost protection and harvest, particularly after the application of pesticides and fertilizers over the course of the growing season." *Id.* "In short, cranberry bogs do not simply collect and discharge rainwater, like the sugarcane fields in Closter Farms, and the water in cranberry bogs for frost protection and harvest is not 'excess water.'" *Id.* The water from cranberry bogs is thus not composed entirely of return flows from irrigated agriculture, but flows from other uses, including holding water for frost protection and harvest. *Id. Closter Farms* is thus unhelpful for the matter at hand.

Here, the discharge from the Marshes into Musky Bay is not "entirely" return flow from irrigation. The polluted water returned to Musky Bay is the result of harvest, pest control, and water used in the winter for frost and freeze protection. Def. Br. at 4, citing DPFOF ¶¶ 17-20. Moreover, the Plaintiffs' complaint only challenges discharges of water used by the Trust for non-irrigation purposes. Compl. ¶¶ 49, 57, 61 (Doc. 1); Amend. Compl. ¶¶ 49, 57, 61 (Doc. 32). Because the water discharged from the Marshes is not entirely for the irrigation of agriculture, the irrigation return flow exception does not apply.

Taken together, because the Trust discharges pollutants from its Marshes through point sources into the Lake, the Trust should have applied for a WPDES

permit for its discharges, particularly discharges of non-irrigation water. In failing to do so, it violated the Clean Water Act.

### D.  Wisconsin Department of Natural Resources guidance has no bearing on the legal issue before the Court.

No court has ever decided whether operations like the Trust's are subject to the Clean Water Act's permitting requirements. No administrative agency has ever determined in a contested case hearing whether such operations are subject to the Clean Water Act's permitting requirements. In the absence of DNR action, and after attempting numerous other interventions to secure changes to the Trust's operations to mitigate or halt the ongoing pollution of the Lake, Plaintiffs brought this Clean Water Act citizen enforcement action.

The Trust seeks to foreclose a determination by this Court, arguing that the DNR has already resolved the issue. Specifically, it claims that "cranberry marshes in general and the Zawistowski Marshes in particular are not point sources" and therefore are not subject to Clean Water Act regulation because the DNR has, in several letters, memoranda, comments made in the rulemaking process for non-Clean Water Act administrative rules, and the like, stated that it did not feel the Act applied to those operations. Def. Br. at 17. Respectfully, Plaintiffs disagree. It is time for this issue to be addressed on a full factual record in an adversarial setting, so that an authoritative interpretation of the Clean Water Act's application to the Trust's polluting activities can be made. *See Ohio Valley Env't Coalition, Inc. v. Hobert Min., LLC*, 723 F. Supp. 2d 886, 902 (S.D.W.Va.

2010) (stating the CWA's citizen suit provision "permits citizens to abate pollution when the government cannot or will not command compliance") (citation and internal quotation marks omitted).

The communications from the DNR cited by the Trust are not decisions in any contested case hearing. They are not promulgated rules. They are not private letter rulings. They are no other form of recognized "law." They have no legal force or effect. They are merely guidance documents: "any formal or official document or communication issued by an agency, including a manual, handbook directive, or informational bulletin, that…"[e]xplains the agency's implementation of a statute or rule enforced or administered by the agency" or "[p]rovides guidance or advice with respect to how the agency is likely to apply a statute or rule enforced or administered by the agency…" Wis. Stat. § 227.01(3m)(a). "A guidance document does not have the force of law…" Wis. Stat. § 227.112(3).

> As the Wisconsin Supreme Court put it, guidance documents:
>
> provide no authority for implementing or enforcing standards or conditions. They simply 'explain' statutes and rules, or they 'provide guidance or advice' about how the executive branch is 'likely to apply' a statute or rule. They impose no obligations, set no standards, and bind no one. …**Functionally, and as a matter of law, they are entirely inert. That is to say, they represent nothing more than the knowledge and intentions of their authors.**
>
> ***
>
> A guidance document cannot affect what the law is, cannot create a policy, cannot impose a standard, and **cannot bind anyone to anything.**

This is all true because guidance documents merely explain statutes
and rules, or provide guidance or advice about how the executive is
likely to apply them.

*SEIU v. Vos*, 2020 WI 67, ¶ 102, 105-106, 393 Wis. 2d 38, 946 N.W.2d 35 (emphasis
added).

To the extent the DNR documents contain that agency's legal

interpretation, the Wisconsin Supreme Court and Wisconsin Legislature have

directed that agency legal interpretation are entitled to no deference. *Tetra Tech*

*EC, Inc. v. Wis. Dep't of Revenue*, 2018 WI 75, ¶¶ 3, 54, 382 Wis. 2d 496, 914 N.W.2d

21; *see also* Wis. Stat. § 227.57(11) ("Upon review of an agency action or decision,

the court shall accord no deference to the agency's interpretation of law."). At

most, courts can give "due weight" to an agency's interpretation, which means

giving "'respectful, appropriate consideration to the agency's views'," but the

courts must still exercise their independent judgment in deciding questions of

law. *Tetra Tech*, 382 Wis. 2d 496, ¶ 78 (quoting Wis. Stat. § 227.57(10)). In other

words, "'due weight' is a matter of persuasion, not deference'." *Id.*

Whether the pollution from the Trust's cranberry bog operations is subject

to regulation under the Clean Water Act is an open question. The DNR's remarks

have not settled this issue at all, nor have they provided any reasoning that

would give them persuasive power, either.[7] Also, considering that

---

[7] For instance, the DNR's materials do not describe the facts considered or provide any reasoning
or analysis. Instead, they generally simply state in a single conclusory sentence or sentence
fragment that the CWA does not require cranberry operations to have discharge permits, or that
cranberry bogs are considered to be "nonpoint sources." *See, e.g.*, Heilman Dec., Ex. B (Doc. 30-2);
Ex. K, p. 2 (Doc. 30-11); Ex. M, p. 2 (Doc. 30-13). Alternatively, they regurgitate the 2013 letter

Wisconsin's statute was not amended to exempt "return flows from irrigated agriculture" from permitting until 2017, *see* Section I.B.1., *supra*, it begs the question of what, exactly, the DNR was relying on in state law for its interpretation that cranberry marsh discharges were not point sources prior to that year.

The Court should reject the Trust's argument that the Clean Water Act does not require a discharge permit and/or does not apply to cranberry operation discharges because various DNR representatives have so remarked in guidance documents such as letters and rulemaking materials. Despite the Trust's mischaracterization of this guidance as holdings ("DNR Continues to Hold…" Def. Br. at 7; "DNR has long and consistently held…" Def. Br. at 17) there is no holding in any court or administrative case, nor are there any state or federal administrative rules, that provide that the pollution coming from cranberry bogs cannot be or is not regulated under the Clean Water Act. To the contrary, as shown above, it can be and is. This Court should so find.

### E.  United States Environmental Protection Agency guidance has no bearing on the legal issue before the Court.

The Trust also points to a January 4, 2010 email it claims is from the United States Environmental Protection Agency ("EPA"), and a letter from EPA

---

from two EPA staff members discussed below. *See, e.g.,* Heilman Dec., Ex. L, p. 20 (Doc. 30-12); Ex. P, p. 20 (Doc. 30-16).

Plaintiffs refer to the DNR and EPA guidance documents attached to the Heilman Declaration, rather than citing to proposed findings of fact, because the documents are offered by the Trust as legal authority, not as proposed facts.

staff, as well as an agency guidance memorandum on the application of aquatic herbicide to an irrigation channel, to claim that EPA "Has Long Held that Zawistowski Marshes Are Not Point Sources." Def. Br. at 14. Just like the DNR guidance documents relied on by the Trust, correspondence from EPA staff is not a holding. Nor is a memorandum of guidance. The Trust's efforts to mislead this Court should be rejected.

Moreover, the 2010 email the Trust cites to support its claim that "EPA rejected" efforts to consider the Trust's discharges a "point source," attached to the Heilman Declaration as Exhibit C, is not from the EPA at all. Def. Br. at 14. It is from Robert Masnado, who, according to the Declaration of Cheryl W. Heilman, is a DNR "staff member," and appears to be a message sent only to other DNR staff. PPFOF ¶ 60. More importantly, Mr. Masnado's email says nothing about the EPA rejecting efforts to treat the Trust's cranberry marshes as a point source. Rather, it says that the EPA will be including Musky Bay on its Impaired Waters List, and that several people would be discussing a request "that the local cranberry marsh discharge be treated as a point source." Heilman Dec., Ex. C (Doc. 30-3).

The Trust's misleading representations to the Court notwithstanding, it does acknowledge that any EPA interpretation of the Clean Water Act is "not binding on this Court." Def. Br. at 15. That is correct. It then goes on to argue, however, that as a "longstanding interpretation by the responsible regulatory agency" a 2013 letter from EPA staff is "persuasive," citing *Skidmore v. Swift,* 323

U.S. 134, 140 (1944). First, as the Trust acknowledges, the EPA is not the "responsible regulatory agency" or sole responsible regulatory agency; the agency which administers the CWA in Wisconsin is the DNR. Def. Br. at 2.

But second and more importantly, the 2013 letter does not fit the *Skidmore* doctrine at all. It is not a ruling, interpretation, or opinion of an agency Administrator. It is a letter from two EPA staff members that presents in a single paragraph the conclusion that "[b]ased on currently available information," the writers view the Trust's discharges to be "return flows from irrigated agriculture" and therefore exempt from CWA permitting requirements. Heilman Dec, Ex. F (Doc. 30-6). The writers fail to describe what information they considered in reaching this conclusion and the letter is also devoid of any reasoning applying any facts to the law. Thus, this letter is hardly the kind of "informed judgment" that offers any persuasive value. *See Skidmore, supra.* Indeed, it is a far cry from the interpretive bulletin and informal rulings, coupled with an agency's amicus curiae brief, referred to as useful guidance in *Skidmore.* It is at best like the "thinly-reasoned decision by a single deportation officer" that the Seventh Circuit declined to afford any persuasive value to in *Mendoza v. Sessions,* 891 F.3d 672, 676 (7th Cir. 2018). The Court should similarly disregard the 2013 EPA staff letter and reach its own conclusions based on the facts and law presented in this case.

The undated EPA memorandum regarding pesticides does not fare much better. Def. Br. at 14-15.[8] It mainly repeats the language of statute and legislative history, which actually confirms the interpretations Plaintiffs discuss in Section I.C.1, *supra*. The backdrop of that memo was a 2001 case that found irrigation canals themselves were "waters of the United States," which is not the issue here. *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526 (9th Cir. 2001). The Trust cites the memo to claim that EPA understands the irrigation return flow exemption to "be broader than just water used to get moisture to the roots of the crops." Def. Br. at 15. This is a stretch, since the EPA's main point was to clarify that herbicides could be applied to canals to ensure the free flow of irrigation water was not clogged by vegetation. There is not much analysis in the memo, however, even for that conclusion.

If there is any remaining doubt that passing thoughts from EPA staff on the applicability of the CWA's pollution permitting requirements on the Trust's cranberry growing operations have no bearing here, the United States Supreme Court's June 28, 2024 decision overruling the *Chevron* deference doctrine should eliminate that doubt. *Loper Bright Enterprises v. Raimondo,* No. 22-451, slip op. (U.S. June, 28, 2024). In that case, the Supreme Court held that the Administrative Procedure Act requires courts to exercise independent judgment, and courts may not defer to agency interpretation of the law simply because a statute is

---

[8] Citing https://www3.epa.gov/npdes/pubs/talentfinal.pdf (last visited July 2, 2024).

ambiguous. *Id.* at slip op. 35. While that opinion left the *Skidmore* doctrine intact—for now, *id.* at slip op. 16-17—it signals the Court's skepticism of reliance on administrative agencies even when Congress gives an agency discretion to interpret a statute.

This Court must exercise its independent judgment in this case, applying the uncontested facts to the law as it was enacted by Congress, and find that the Trust is subject to the CWA pollution permitting requirements. The musings of EPA staff presented by the Trust have no value here.

## II.    The Trust's due process arguments are without merit.

The Trust contends that because the DNR and EPA have not historically required it to obtain a WPDES permit, it would be unfair and violate due process for this Court to find liability. Def. Br. at 19. As noted above, the agencies' positions to date are not law; they also do not shield the Trust from liability, and their historic failure to enforce the law does not bind this Court as a matter of due process or otherwise. This Court should reject the Trust's argument that finding liability here would violate due process.

### A.    *The due process argument is tied to a "permit shield" defense, which the Trust does not claim here.*

The primary case on which the Trust relies, *Wisconsin Resources Protection Council v. Flambeau Mining Company*, 727 F.3d 700 (7th Cir. 2013), does not apply here. As detailed below, the *Flambeau* court protected a mine from liability based on a "permit shield" and due process defense, because the mine had a mining

41

permit that the DNR said was sufficient for purposes of the WPDES program. Unlike the defendant in that case, the Trust has no permit whatsoever regulating its discharges.

*Flambeau* concerned a recently-closed copper mine that was still discharging residual copper through stormwater flow to the Flambeau River. While the mine operator held separate WPDES and mining permits while the mine was in operation, the DNR decided that stormwater discharges would be regulated solely through the mining permit after the mine had closed. *Id*. at 704. The plaintiffs sued, alleging that the mining permit was not a WPDES permit and that the company was therefore violating the Act by discharging without a permit under the CWA. *Id*. at 705. The mining company countered that its mining permit sufficed, an argument the district court rejected based on its finding that the mining permit was issued under regulations that were not part of Wisconsin's CWA permit program. *Id*. at 705-706.

The mining company revived its argument that its mining permit sufficed on appeal, where the issue was whether the CWA's "permit shield" applied to bar defendant's liability. 727 F.3d at 706. The Seventh Circuit explained the "permit shield" as follows:

> The CWA makes "unlawful" "the discharge of any pollutant by any person" "[e]xcept as in compliance with" certain statutory provisions. 33 U.S.C. § 1311(a). One such provision is the NPDES permit, which "sets out the allowable departures from the CWA's baseline of total liability for discharges." *Piney Run Pres. Ass'n v. Cnty. Commis.*, 268 F.3d 255, 266 (4th Cir.2001). The CWA's permit shield provision, 33 U.S.C. § 1342(k), specifies that "if a [NPDES]

permit holder discharges pollutants precisely in accordance with the terms of its permit, the permit will 'shield' its holder from CWA liability." *Piney Run Pres. Ass'n,* 268 F.3d at 266; *see also* 33 U.S.C. § 1342(k) (providing that "[c]ompliance with a permit issued pursuant to this section shall be deemed compliance[ ]" for purposes of the federal compliance provision and the citizen suit provision); *Coon v. Willet Dairy, LP,* 536 F.3d 171, 173 (2d Cir.2008) (noting that, under the permit shield, "compliance with an authorized permit is deemed compliance with the CWA, so as long as [the defendant] was acting in accordance with its permit it could not be liable in a citizen suit for CWA violations"). The Supreme Court has explained that the permit shield's purpose is "to relieve [permit holders] of having to litigate in an enforcement action the question whether their permits are sufficiently strict. In short, [the permit shield] serves the purpose of giving permits finality." *E.I. du Pont de Nemours & Co. v. Train,* 430 U.S. 112, 138 n. 28, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977).

727 F.3d at 706.

The court then declined to rule on the issue of whether the mining permit was an actual WPDES permit, stating that "even if Flambeau's permit were legally invalid, we cannot, consistent with the requirements of due process, impose a penalty on Flambeau for complying with what Wisconsin deemed a valid WPDES permit." *Id.* at 707. The court went on to find that the mining company did not have notice from DNR that its permit "might not be a valid WPDES permit or that it needed a permit other than the one the WDNR determined was required," and that resort to regulations the DNR had codified would have confirmed this understanding on the part of the company. *Id.* at 708-09.

The takeaway from *Flambeau* is that, for the mining company to be exempt from the CWA's permitting requirements—for the "except in compliance with"

provision in 33 U.S.C. § 1311 to apply—it had to have an argument that the permit shield applied. *See* 727 F.3d at 710. This necessarily required some kind of permit. The court did not recognize a freestanding "due process" or "fair notice" exemption from the CWA; rather, this argument had to be made in tandem with the permit shield argument. Subsequent cases have recognized this distinction. *See, e.g.*, *Johnson v. 3M*, 563 F. Supp. 3d 1253, 1290–91 (N.D. Ga. 2021), aff'd sub nom. *Johnson v. 3M Co.*, 55 F.4th 1304 (11th Cir. 2022) (denying defendant's motion to dismiss on due process grounds because "unlike the defendant in Flambeau, [defendant] does not hold a valid NPDES permit for the point source charges of PFAS alleged in the Complaint, and thus cannot make a permit shield argument").

Similarly, the *Flambeau* decision relied on the fact that DNR had published regulations that authorized regulating discharges under the kind of permit the mining company possessed. 727 F.3d at 709 ("a private party is entitled to rely on published regulations"). Courts have rejected the application of *Flambeau* where a party is not challenging the clarity of administrative regulations and whether those regulations provided it with sufficient notice of what conduct is prohibited. *E.g.*, *Sterigenics U.S., LLC v. Kim*, 385 F. Supp. 3d 600, 612–14 (N.D. Ill. 2019) (noting *Flambeau* "dealt with regulations that were unclear and did not give fair warning of the conduct that the regulations prohibited or required"); *United States v. Navistar Int'l Corp.*, 240 F. Supp. 3d 789, 799 (N.D. Ill. 2017). This makes sense: while parties may dispute whether a *regulation* provides fair notice of an

44

agency's position, courts are as well or better positioned as the agency to interpret a *statute* and a defendant's obligations under that statute. *See* Sections I.D-E, *supra*.

Based on the facts here, *Flambeau* has no applicability. First, the Trust admits it has no WPDES permit regulating its discharge. PPFOF ¶ 53. It also does not claim, in its proposed findings, that it has any sort of other permit regulating its discharge. *See generally* DPFOF (Doc. 27). It simply says that "Cranberry operations in Wisconsin do not have discharge permits for water used in the marshes and then returned to a surface water body," and that "[n]o one from the DNR has ever told a representative of W.D.Z. Cranberries [the operator of the Trust's marsh] that a WPDES discharge permit is required for either Marsh." DPFOF ¶¶ 33, 34; *see also* DPFOF ¶ 50. The Trust does not claim—and curiously, barely mentions—the permit shield defense in its brief. *See generally* Def. Br. at 19-20. Based on the total lack of any permit on which it could claim the permit shield defense, there is no basis for applying *Flambeau* here.

In fact, the implication that a regulator's failure to require a permit—due to misunderstanding of the law, lack of resources, collusion with a polluter, or other reasons—could shield a polluter from the CWA, including an obligation to comply in the future, is a disturbing theory that, if adopted, could allow evasion of the CWA and defeat its purpose of cleaning up the nation's waters. The Supreme Court has rejected the EPA's interpretation of the CWA's permitting provisions where similar consequences would result. *Cty. of Maui*, 590 U.S. at 180

45

(noting that while courts often pay "particular attention to an agency's views" in light of its expertise and experience, "to follow EPA's reading would open a loophole allowing easy evasion of the statutory provision's basic purposes. Such an interpretation is neither persuasive nor reasonable").

Similarly, there are no regulations codifying the DNR's apparent belief that cranberry marshes are completely exempt from CWA permitting requirements, and the Trust cannot claim it was innocently relying on DNR rules that allowed it to not obtain a permit. The only issue is interpretation of a statute—here, the CWA. Since DNR has issued no regulations on the applicability of permitting requirements to cranberry growing operations, *Flambeau* is inapposite for this reason as well, and the fair notice defense is inapplicable.

The Court can reject the Trust's due process argument on this basis alone.

### B.   No due process defense to liability exists based on an agency's "public statements."

The Trust makes a passing comment that the "due process" argument from *Flambeau* could also be triggered by "public statements issued by the agency," (Def. Br. at 20) but to the extent this argument ever had legs, that argument has since been precluded by the Supreme Court of the United States in *County of Maui, supra*.

1. *County of Maui precludes Defendant's arguments that an agency's public statements can preclude liability, though agency action can be considered in the remedy phase.*

*County of Maui* concerned a polluter that, like the Trust, never had any permit for its discharges. In that case, Justice Alito dissented from the majority's opinion on similar grounds the Trust cites here: the wastewater treatment facility had been in existence since the 1970s and had never been subject to the CWA's permitting requirement. 590 U.S. at 196-97 (Alito, J., dissenting). This was "well known" to both the EPA and the Hawaii Department of Health; indeed, the EPA had even financed the construction of the facility with a grant under the CWA. *Id.* It was also known to these agencies when the plant was constructed that the discharges would eventually make it to the ocean. *Id.* Said Justice Alito, "despite nearly five decades of notice that effluent from the facility" would reach groundwater and the ocean, and the fact that 6,600 similar wells in Hawaii lacked CWA discharge permits, the plaintiffs filed a citizen suit against the facility. *Id.* at 197.

The majority did not find that the longstanding failure of the facility to have a permit, and longstanding failure of regulators to require one for defendant or others, was any bar to enforcement of the CWA. *Id.* at 185-86. Rather, concerns relating to notice by the polluter could be addressed in the

remedy phase, which gives courts discretion to reduce the maximum daily

monetary penalty through consideration of statutory factors[9]:

> Judges … can mitigate any hardship or injustice when they apply
> the statute's penalty provision. That provision vests courts with
> broad discretion to set a penalty that takes account of many factors,
> including "any good-faith efforts to comply" with the Act, the
> "seriousness of the violation," the "economic impact of the penalty
> on the violator," and "such other matters as justice may require."
> See 33 U.S.C. § 1319(d). **We expect that district judges will exercise
> their discretion mindful, as we are, of the complexities inherent
> to the context of indirect discharges through groundwater, so as
> to calibrate the Act's penalties when, for example, a party could
> reasonably have thought that a permit was not required**.

*Id*. (emphasis added).

The same logic applies here. While this case does not concern the

"complexities" of groundwater to the point that "a party could reasonably have

thought that a permit was not required," the Trust has argued that it could

reasonably have thought a WPDES permit was not required for different reasons.

Def. Br. at 21-22. These include the lack of any binding agency or court guidance

on the extent to which the irrigation return flow exception applies to cranberry

producers and informal communications with DNR employees. *See id*. Also

present are the complexities of different kinds of agriculture and different kinds

---

[9] These factors are

> the seriousness of the violation or violations, the economic benefit (if any)
> resulting from the violation, any history of such violations, any good-faith efforts
> to comply with the applicable requirements, the economic impact of the penalty
> on the violator, and such other matters as justice may require.

33 U.S.C. § 1319(d).

of agricultural discharge. While these factors may have contributed to the Trust's claimed belief that it did not need to apply for a WPDES permit, they do not make it any less liable under the CWA's strict liability provisions. 590 U.S. at 185-86. In other words, while a defendant's "good faith" is not a defense to liability, it is relevant in the penalty phase. *Calif. Pub. Interest Research Grp. v. Shell Oil Co.*, 840 F. Supp. 712, 714 (N.D. Cal. 1993) (citing cases) (noting the CWA's strict liability scheme and rejecting oil company's argument that it lacked liability due to its interpretation of its permit).

The Supreme Court's ruling in *Maui* also addresses the Trust's hyperbolic argument that it should not be subject to "crushing penalties" for not obtaining a WPDES permit. Def. Br. at 22 & n.2. While the maximum penalty for CWA liability is currently $66,712 per day, this amount is reduced by the factors the Act itself requires the district court to consider, as recently confirmed in *Maui*. Moreover, the Act provides for other relief that is more important to ensuring the Lake's water quality is improved and protected: injunctive relief requiring the Trust to apply for and obtain a WPDES permit to regulate its future discharges. *See* Doc. 1 at 25; 33 U.S.C. § 1365(a). Regulating the discharges would in turn require DNR to ensure water quality standards are met and require the implementation of appropriate best management practices ("BMP") and other controls to do so. *See* Regulatory Background, *supra*. The Trust itself has admitted that its already partially implements one BMP on the East Marsh, which is the use of a tailwater recovery system that holds water and allows it to be reused,

49

rather than constantly discharging and pumping in water from the Lake. DPFOF ¶¶ 24-26.

> 2. *Defendant cites inapposite case law for its "agency statements" claim.*

The Trust cites no case that holds an agency-endorsed lack of a permit supports a fair notice or due process defense in a private civil action. At most, it says "[f]air notice principles include 'public statements issued by the agency'." Def. Br. at 20 (citing *Flambeau*, 727 F.3d at 708). This statement, in turn, derived from a case called *Howmet v. EPA*, wherein a company filed a challenge to the EPA's enforcement decision under the Resource Conservation and Recovery Act. 614 F.3d 544, 548 (D.C. Cir. 2010). The *Howmet* case represents a much more typical application of the fair notice defense, where an agency's interpretation of a regulation is challenged in an administrative proceeding, *see id.* at 553, as opposed to an interpretation in a civil case, *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 250 (3d Cir. 2015).

In *Howmet*, the court concluded that the agency's interpretation of the regulation in that case was reasonable and entitled to deference, but that even if the rule lacked clarity, a guidance document the EPA had published in the Federal Register explained the interpretation and provided fair notice. *Howmet*, 614 F.3d at 554. The Trust cites no similar document from the DNR or EPA here, even if the fair notice defense could apply here after the Supreme Court's decision in *County of Maui*. The scattered interpretations across DNR and EPA

50

correspondence and memoranda are not law or even persuasive authority, *see* Section I.D. & E., *supra*. Most of the documents discuss other matters and raise the irrigation return flow exception as a side issue; there is little analysis or notice, and certainly no rulemaking or other proposal that would have given the public the opportunity to comment on the DNR's legal interpretation.[10] The DNR's position reflected across these documents appears to be more "urban legend" than legal application of facts to law.

In sum, and as clarified by the Supreme Court of the United States in *County of Maui*, the CWA does not permit discharges to avoid liability simply because a regulator has not, to date, required a permit. The Court should reject the Trust's due process defense.

### C. The Trust's **sub rosa** *laches argument is without merit.*

What the Trust really seems to be saying is not that there would be a due process violation if it is found to be in violation of the CWA, but that Plaintiffs are guilty of laches or have waived their claims by not filing a court action against the Trust sooner. Def. Br. at 21-22. The Court should reject this suggestion.

First, the Trust has been on notice from numerous sources that its cranberry marshes are or may be a point source subject to CWA pollution permitting requirements. In 2006, the State of Wisconsin and 12 property owners

---

[10] The rulemakings the Trust cites were on other issues, such as whether to lower the phosphorus standard for Lac Courte Oreilles. See Docs. 30-11, 30-14.

on Lac Courte Oreilles brought a public nuisance action against William Zawistowski ("Zawistowski"), the Trust's predecessor (DPFOF ¶ 9), for degrading Musky Bay with phosphorus-laden water during Discharge Events. Sivertson Dec., Ex. B: Findings of Fact, Conclusions of Law and Decision of Sawyer County Circuit Court Judge John P. Anderson, April 5, 2006. While the state and the property owners technically lost the case because the circuit court believed there must be 100 percent loss of use and enjoyment of Musky Bay to establish a public nuisance (as opposed to just the partial loss that the court determined), the court found that Zawistowski's discharges are through "distinct ditches" and that "[e]ach ditch or canal is manmade and are connected to Musky Bay." *Id.* at 3. The court found that these ditches and canals "…now act as the *point source* for much of the phosphorus discharged into Musky Bay." *Id.* at 16 (emphasis added).

In 2007, a law review article made the case that cranberry marshes are point sources, based on a detailed examination of statutory language, legislative history, and case law. Andrew C. Hanson & David C. Bender, *Irrigation Return Flow or Discrete Discharge? Why Water Pollution from Cranberry Bogs Should Fall Within the Clean Water Act's NPDES Program*, 37 Envtl. Law 339 (2007). It discussed the Trust's operation specifically and why the CWA could and should apply to its discharges. This is a far cry from DNR's unsupported statement that cranberry bogs are exempt from regulation because they meet the definition of

52

return flow from irrigated agriculture on which the Trust relies. Def. Br. at 21 (citing Heilman Dec., Ex. L (Doc. 30-12)).

Plaintiffs have publicly taken this position, as well. The Trust points to a 2016 lawsuit Plaintiffs filed but later partly dismissed, claiming Plaintiffs "understood DNR's unequivocal position because they sued DNR in 2016 seeking a judicial determination that cranberry marshes, including specifically the Zawistowski Marshes, are point sources that require a discharge permit'." Def. Br. at 21. The Trust misrepresents the litigation, which contained five claims, most relating to the DNR's denial of a petition Plaintiffs and others had filed seeking a site-specific phosphorus limit for Lac Courte Oreilles under the process in Wis. Admin. Code § NR 102.06(7). Heilman Dec., Ex. G (Doc. 30-7) at 9-14. The fifth claim did challenge the DNR's comment in its denial letter that "Musky Bay is impaired due to nonpoint pollution" and that there were other ways to address its impairment outside of a regulatory planning process. Heilman Dec., Ex. G (Doc. 30-7) at 13, 88-89. However, the cause of Musky Bay's impairment (whether from point or non-point sources) was not the focus of the litigation, and the parties eventually stipulated to the dismissal of the fifth claim as part of an overall resolution that required the DNR to conduct a rulemaking process related the site-specific phosphorus criterion as Plaintiffs had originally requested. Heilman Dec., Ex. I (Doc. 30-9). The stipulation specifically provided, "Petitioners reserve their right to bring the declaratory judgment portion of claim five at any time, in any venue." *Id*. at 7. Counsel for the Wisconsin Cranberry

Growers had appeared in the case to litigate the fifth claim and agreed to the stipulation. *Id*. at 11.

Hence, the Trust cannot claim it was unfairly surprised by the argument that the Trust's marshes are a polluting point source under the CWA, whether made by a Wisconsin circuit court judge, law review articles, or Plaintiffs, who clearly reserved this claim. The efforts to exhaust other remedial avenues before bringing a costly federal lawsuit certainly does not meet the criteria for laches, or "culpable delay in suing."[11] *Teamsters & Employers Welfare Tr. of Illinois v. Gorman Bros. Ready Mix*, 283 F.3d 877, 880 (7th Cir. 2002). That defense requires a two-fold showing of (1) lack of diligence by the plaintiffs, and (2) prejudice to the defendants. *United States v. City of Loveland, Ohio*, 621 F.3d 465, 473 (6th Cir. 2010). That Plaintiffs at times devoted their limited resources to other strategies for preserving Lac Courte Oreilles, like pursuing the 10 ppm site-specific phosphorus criteria for the Lake,[12] before initiating this litigation, does not make the argument any less of the surprise. And on the second factor, the Trust was not prejudiced by being permitted to continue discharging phosphorus and other

---

[11] The Trust did assert laches as an affirmative defense in this case. Doc. 7 at 11. That it does not brief laches with its motion for summary judgment indicates that it recognizes the weakness of this defense.

[12] In the end, the DNR finally adopted the rule, but it took multiple trips to circuit court to ensure DNR made good on its promise to execute the rulemaking process, and another petition to the DNR to re-start the process when the DNR Board initially denied the rulemaking petition. The rule was finally promulgated late last year. Heilman Dec., Ex. K (Doc.30-11) (initial rulemaking), Ex. N (Doc. 30-14) (restarted rulemaking); *see also* Dane County Circuit Court Case Nos. 16CV1564, 18CV758.

pollutants to the Lake for a longer period, without consequences. In any case, the CWA observes the five-year statute of limitations in 28 U.S.C. § 2462, so only the last five years of discharges are subject to litigation anyway.

The Court should reject the Trust's *sub rosa* laches defense.

## CONCLUSION

For the reasons set forth above, Plaintiffs Courte Oreilles Lakes Association, Inc. and Lac Courte Oreilles Band of the Lake Superior Chippewa respectfully ask this Court to deny the Trust's Motion for Summary Judgment. To the extent Plaintiffs' arguments are dispositive, they ask that summary judgment on the legal issues presented be granted to them.[13]

Respectfully submitted this 3rd day of July 2024.

PINES BACH LLP

*Electronically signed by Christa O. Westerberg*

Christa O. Westerberg, SBN 1040530
Tamara B. Packard, SBN 1023111
Samantha R. Foran, SBN 1122735
122 West Washington Ave., Ste. 900
Madison, WI 53703
(608) 251-0101 (telephone)
(608) 251-2883 (facsimile)
cwesterberg@pinesbach.com
tpackard@piensbach.com
sforan@pinesbach.com

---

[13] Plaintiffs note that they will be moving for summary judgment on any remaining issues, but only after they have had the opportunity to take discovery and provide expert testimony. The deadline for summary judgment motions is December 6, 2024. Doc. 22 at 3.

LAW OFFICE OF SIVERTSON AND
BARRETTE, P.A.

*Electronically signed by Alf E. Sivertson*
Alf E. Sivertson (MN 122233)
1465 Arcade Street
Saint Paul, MN 55106-1740
(651) 778-0575 (telephone)
(651) 778-1149 (facsimile)
alf.sivertson@sivbar.com

*Attorneys for Plaintiffs*