IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

COURTE OREILLES LAKES ASSOCIATION
INC.

and

LAC COURTE OREILLES BAND OF THE LAKE
SUPERIOR CHIPPEWA

                Plaintiffs,

v.

Case No. 3:24-CV-128

ROSALIND C. ZAWISTOWSKI, as TRUSTEE of
the ZAWISTOWSKI JOINT REVOCABLE
TRUST

                Defendant,

and

RURAL MUTUAL INSURANCE COMPANY

                Intervenor Defendant.

**REPLY BRIEF OF DEFENDANT ROSALIND C. ZAWISTOWSKI IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant, Rosalind C. Zawistowski, as Trustee of the Zawistowski Joint Revocable Trust, submits this Reply Brief in Support of Motion for Summary Judgment.

**<u>INTRODUCTION</u>**

Now that Plaintiffs have filed their response brief, it is clear that Defendant is entitled to summary judgment. Under the undisputed facts, the water released from the marshes to Musky Bay are "return flows from irrigated agriculture," which means that no discharge permit is required. Plaintiffs argue to the contrary based upon a law review article that has never been cited by any court. Plaintiffs ignore the plain language of the statute, claim that the case that is

fatal to their lawsuit was wrongly decided, misconstrue legislative history, and disregard decades of consistent interpretation by the responsible regulatory authorities.

A second and independent basis for summary judgment is that Rosalind Zawistowski had no fair notice of any requirement that she obtain a discharge permit. Quite the contrary, DNR has consistently said that no WPDES permit is required, and the State of Wisconsin declared in court that there is no law requiring the Zawistowski marshes to have a discharge permit.

In a desperate attempt to justify their current case, Plaintiffs refer to a 2004 nuisance lawsuit brought by 14 lake property owners and the State of Wisconsin against William Zawistowski (the deceased husband of Defendant) regarding the same marshes. Those plaintiffs lost that case after a full trial and the decision was affirmed by a unanimous Court of Appeals. That case does not help Plaintiffs; rather, it emphasizes the unfair and groundless nature of this case.

Finally, Plaintiffs failed to explain how they can pursue civil penalties and an injunction requiring Defendant to obtain a WPDES permit when she did not and does not have the ability to do so because DNR does not and has never issued such permits to cranberry marshes. Plaintiffs understand that reality because they sued DNR eight years ago for a declaration that cranberry marshes, including the Zawistowski marshes, are point sources that require a discharge permit – but then chose to dismiss that claim.

Plaintiffs' claims are totally groundless and manifestly unfair to Defendant. Summary judgment should be granted.

**ARGUMENT**

I. **PLAINTIFFS' INTERPRETATION OF "RETURN FLOWS FROM IRRIGATED AGRICULTURE" IS WRONG AS A MATTER OF LAW.**

The threshold issue on this motion and in this case is the meaning of the phrase "return flows from irrigated agriculture" as applied to the material facts, which are undisputed. The parties agree that the phrase is not defined in the statute. The correct meaning of the phrase drives the conclusion that summary judgment dismissing this action is appropriate. The interpretation argued by Plaintiffs is wrong as a matter of law.

Plaintiffs state that "the starting point for interpreting a statute is the language of the statute itself." (Dkt. 34, p. 23), *quoting Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49 (1987). However, they cite no dictionary definitions of the key words in the statute, despite the fact that Defendant provided such definitions. (Dkt. 26, pp. 11-12). The Ninth Circuit Court of Appeals explained that "agriculture" has a "broad meaning that encompasses crop production." *Pacific Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1084 (9th Cir. 2019).

Plaintiffs do not dispute that the cranberry marshes are engaged in agriculture or that the marshes are irrigated. They do not dispute that water is drawn from Musky Bay and returned to it. They do not provide an analysis of the plain language of the statute, despite acknowledging that such an analysis is the starting point for statutory interpretation. (Dkt. 34, p. 23).

They contend that there is "inconsistency within the statute itself" between the phrase in 33 U.S.C. §§ 1362(14) and 1342(l)(1). (Dkt. 34 pp. 23-24). Their discussion is hard to follow. It is apparently intended to create an ambiguity between the two provisions that necessitates resort to legislative history. An issue may arise if the water in the return flow comes in part from activities other than agriculture. However, there is no ambiguity as applied to the facts in this

case because it is undisputed that all return flows from the Defendant's marshes are from activities related to crop production. (Dkt. 26, p. 12; Proposed Findings of Fact in Support of Motion for Summary Judgment of Defendant Rosalind C. Zawistowski, as Trustee of the Zawistowski Joint Revocable Trust ("DPFOF"), Dkt. 27, p. 3, ¶¶ 21-22).

Despite the lack of ambiguity in the plain meaning, Plaintiffs turn to a legislative intent argument. (Dkt. 34, pp. 24-26). However, the Ninth Circuit's analysis of legislative intent in *Glaser* confirms the meaning of the phrase "composed entirely of" in § 1342(l)(1). The question was relevant in that case because the plaintiffs alleged that there were multiple discharges that commingled in the channel and were not all from agricultural activities. The Ninth Circuit analyzed the legislative history of § 1342(l)(1) as follows:

> Congress amended the CWA to include an exception for discharges composed entirely of return flows from irrigated agriculture. *Id.* at 1073. "Congress did so to alleviate EPA's burden in having to issue permits for every agricultural point source." *Id.* By passing § 1342(l)(1), **Congress sought "to limit the exception to only those flows which do not contain additional discharges from activities unrelated to crop production."** S. Rep. No. 95-370, 35 (1977), *as reprinted in* 1977 U.S.C.C.A.N. 4326, 4360. This history supports the district court's interpretation of "irrigated agriculture" as used in § 1342(l)(1).

*Glaser*, 945 F.3d at 1084 (emphasis added). The quoted language in the bolded portion is from Senate Report No. 95-370 (1977). The full sentence from the Senate Report is as follows: "The word 'entirely' was intended to limit the exception to only those flows which do not contain additional discharges from activities unrelated to crop production." S. Rep. No. 95-370, 35 (1977), *as reprinted in* 1977 U.S.C.C.A.N. 4326, 4360. The Ninth Circuit further explained:

> **Congress intended for "irrigated agriculture,"** as used in § 1342(l)(1), **to be defined broadly and include discharges from all activities related to crop production**. . . . For these reasons, § 1342(l)(1)'s statutory text, as well as its context, its legislative history, and our prior case law on the Project, demonstrate that **Congress intended to define the term "irrigated agriculture" broadly**. Accordingly, we hold that the district court's interpretation of the phrase was accurate.

*Glaser*, 945 F.3d at 1084-85 (emphasis added). The word "entirely" was intended by Congress to

exclude from the exemption only activities unrelated to crop production:

> Given the many activities related to crop production that fall under the definition of "irrigated agriculture," Congress's use of "entirely" to limit the scope of the statutory exception thus makes perfect sense. The text demonstrates that Congress intended for discharges that include return flows from activities unrelated to crop production to be excluded from the statutory exception, thus requiring an NPDES permit for such discharges.

*Id*. at 1085.

EPA also cited the key sentence from Senate Report No. 95-370 in analyzing legislative intent in its 2002 Guidance document:

> This interpretation finds support in the legislative history of the return flow exemption, based on the Senate's discussion of the word "entirely" in Section 402(l)(1) which **prohibits the Administrator from requiring a permit "for discharges composed entirely of return flows from irrigated agriculture."** The Senate stated that the word "entirely" was "intended to limit the exception to only those flows which do not contain additional discharges from activities unrelated to crop production."

*See* Memorandum from Robert E. Fabricant *et al.*, to Regional Administrators, Interpretive Statement and Regional Guidance on the Clean Water Act's Exemption for Return Flows from Irrigated Agriculture, p. 5 (hereinafter "EPA Memo from Robert E. Fabricant") (emphasis added).[1]

This legislative intent is consistent with Congress' approach of addressing agricultural sources of pollutants differently than industrial sources (with the exception of CAFOs[2], which are expressly included in the point source definition). Like other nonpoint sources, agricultural sources are addressed under section 208 of the CWA. EPA explained:

> In the Senate report, the Senate adopted a broad definition of return flow to include "conveyances carrying surface irrigation return as a result of the controlled application of water by any person to land used primarily for crops." . . . The Senate noted favorably the existence of the **Section 208 program, which does not require an NPDES permits** to address water quality concerns from irrigation return flow: "All such [irrigation return flow] sources, regardless of the manner in which the flow was applied to agricultural

---

[1] *available at* https://www3.epa.gov/npdes/pubs/talentfinal.pdf (last visited June 11, 2024).
[2] A "CAFO" is a concentrated animal feeding operation. *See* 40 C.F.R. § 122.23; Wis. Admin. Code NR § 243.

5

> lands, and regardless of the discrete nature of the entry point, are more appropriately treated under the requirements of section 208(b)(2)(F)." . . . **Section 208(b)(2)(F) establishes a non-NPDES program for addressing various nonpoint sources of pollution, "including return flows from irrigated agriculture, and their cumulative effects."** 33 U.S.C. § 1288(b)(2)(F).

EPA Memo from Robert E. Fabricant, p. 3 (emphasis added). Thus, Congress chose an approach to agriculture pollution impacts that does not entail requiring a discharge permit. The legislative history confirms that the plain meaning of "irrigated agriculture" includes activities related to crop production.

The interpretation by EPA provides further support for Defendants' position. Agency interpretations of the laws they enforce, while not controlling, are persuasive. *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944); (Dkt. 26, p. 15). That continues to be true in light of the Supreme Court's most recent pronouncement:

> The APA, in short, incorporates the traditional understanding of the judicial function, under which courts must exercise independent judgment in determining the meaning of statutory provisions. In exercising such judgment, though, **courts may—as they have from the start—seek aid from the interpretations of those responsible for implementing particular statutes. Such interpretations "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance**" consistent with the APA. *Skidmore*, 323 U. S., at 140. And interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning.

*Loper Bright Enterprises v. Raimondo*, 603 U.S. \_\_\_, 2024 WL 3208360, *13 (June 28, 2024) (emphasis added). This is consistent with the approach of the Wisconsin Supreme Court. *Tetra Tech EC, Inc. v. Wis. Dep't of Revenue*, 2018 WI 75, ¶¶ 78-81, 382 Wis. 2d 496, 914 N.W.2d 21.

The *Glaser* decision and EPA's interpretive statement carry far more weight than the 2007 law review article Plaintiffs rely upon, which has never been cited by any court since it was written 17 years ago. Plaintiffs have ignored the key sentence from the Senate Report. The 2007 law review article did not cite it, either.

Rather than providing a persuasive legislative intent argument, Plaintiffs argue that this Court should not follow *Glaser*. (Dkt. 34, pp. 28-29). They cite four cases, none of which interprets the exemption for return flows from irrigated agriculture. They also cite *County of Maui, Hawaii v. Hawaii Wildlife Fund*, 590 U.S. 165 (2020), which does not construe the key language or the exemption at issue in this case. Further, *County of Maui* was discussed by the district court after the remand in *Glaser*. *See Pacific Coast Federations of Fishermen's Associations v. Conant*, 657 F. Supp 3d 1341, 1358-59 (E.D. Cal. 2023). The district court explained the different issues in *County of Maui* that did not alter the Ninth Circuit's *Glaser* ruling. The district court then reiterated and applied the *Glaser* holding that the irrigation return flows exemption applies to discharges from all activities related to crop production. *Id.* at 1359. Thus, Plaintiffs have provided no valid reason to ignore *Glaser*.

It is undisputed that the return flows from Defendant's marshes are comprised entirely of water used for activities essential to crop production. (*See* DPFOF, Dkt. 27, p. 3, ¶¶ 15-21). Those activities are typical for cranberry marshes. (DPFOF, Dkt. 27, p. 4, ¶ 31). As such, the return flows are within the exception to the definition of "point source," and also the exemption from any permit requirement. For that reason alone, Defendant is entitled to summary judgment.

## II. PLAINTIFFS CLAIM VIOLATES DUE PROCESS.

### A. Plaintiffs' Argument For An Extremely Narrow Scope Of Fair Notice And Due Process Is Contrary To Well-Established Case Law.

As explained in Defendant's opening brief (Dkt. 26, p. 19), a second and independent basis for summary judgment is that Plaintiffs' claims would violate her due process rights because she did not have fair notice of an alleged permit requirement. In response, Plaintiffs argue for an unreasonably narrow scope of the fair notice doctrine. (Dkt. 34, pp. 41-42). They contend that the fair notice doctrine and due process principles set forth in *Wis. Resources*

*Protection Council v. Flambeau Mining Co.*, 727 F.3d 700 (7th Cir. 2013) only applied because that case involved the CWA's permit shield provision, 33 U.S.C. § 1342(k). Plaintiffs argue that there is no "freestanding" due process or fair notice doctrine but, rather, "this argument had to be made in tandem with the permit shield argument." (Dkt. 34, p. 44). A "due process argument is tied to a 'permit shield' defense." (*Id.* p. 41).

Plaintiffs' contention is simply wrong. It ignores the analysis in *Flambeau*, the case law cited therein, and subsequent cases including three from other circuit courts of appeal decided in 2024 and cited in Defendant's opening brief. (Dkt. 26, pp. 19-20)

In *Flambeau,* the Seventh Circuit recognized the basic principles of fair notice and due process:

> Informed by **basic principles of due process**, it is "**a cardinal rule of administrative law**" that a regulated party must be given "**fair warning**" of what conduct is prohibited or required of it. R*ollins Envtl. Servs. (NJ), Inc. v. United States EPA*, 937 F.2d 649, 655 (D.C.Cir.1991) (Edwards, J., dissenting in part and concurring in part).

727 F.3d 707 (emphasis added). The court quoted the following from the Court of Appeals for the District of Columbia:

> In the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability. Of course, it is in the context of criminal liability that this "no punishment without notice" rule is most commonly applied. But as long ago as 1968, we recognized this "fair notice" requirement in the civil administrative context. In Radio Athens, Inc. v. FCC, we held that when sanctions are drastic—in that case, the FCC dismissed the petitioner's application for a radio station license—"**elementary fairness compels clarity**" **in the statements and regulations setting forth the actions with which the agency expects the public to comply**. 401 F.2d 398, 404 (D.C.Cir.1968). This requirement has now been thoroughly "incorporated into administrative law." Satellite Broadcasting Co. v. FCC, 824 F.2d 1, 3 (D.C.Cir.1987); see also Rollins, 937 F.2d at 654 n. 1, 655 (Edwards, J., dissenting in part and concurring in part) (principle is not constitutional, but "b**asic hornbook law in the administrative context**," and "simple principle of administrative law").

*Id.* at 708, *citing Gen. Elec. Co. v. United States EPA,* 53 F.3d 1324, 1328–29 (D.C. Cir. 1995) (emphasis added). *General Electric* did not involve a permit shield. Rather, EPA had entered an

8

order fining General Electric $25,000 for improper disposal of dirty PCB solvent. *Id.* at 1325. The court explained what qualifies as fair notice from the regulatory agency:

> If, by reviewing the regulations and other **public statements** issued by the agency, a regulated party acting in good faith would be able to identify, with "ascertainable certainty," the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation.

*General Elec.*, 53 F.3d at 1329, *citing Diamond Roofing Co. v. OSHRC,* 528 F.2d 645, 649 (5th Cir. 1976) (emphasis added). The *Flambeau* court quoted the same language, *citing Howmet Corp. v. EPA*, 614 F.3d 544, 553-54 (D.C. Cir. 2010). Those cases did not involve a permit shield. What is required for fair notice is thus not limited to cases considering a permit shield defense.

That conclusion is also clear from later cases applying the fair notice doctrine, including cases cited in Defendant's opening brief. (Dkt. 26, pp. 19-20). For instance, in *Wages & White Lion Investments, L.L.C. v. Food & Drug Admin.*, 90 F.4th 357, 374-75 (5th Cir. 2024), the court quoted from Oliver Wendall Holmes: "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *Wages & White Lion Investments*, 90 F.4th at 374, *quoting from McBoyle v. United States*, 283 U.S. 25, 27 (1931). While the statement from Justice Holmes was in a criminal case, the *Wages* court explained that "the fair notice doctrine also applies more broadly to civil administrative proceedings." *Id.* at 375, *citing General Electric.* The fair notice doctrine has been thoroughly incorporated into administrative law. *Radio Athens, Inc. v. FCC,* 401 F.2d 398, 404 (D.C. Cir. 1968).

The fair notice doctrine is a fundamental principle that extends far beyond the narrow

scope that Plaintiffs contend.[3]

### B. Plaintiffs' Argument That Public Statements By DNR And EPA Are Irrelevant Is Groundless.

Plaintiffs argue that public statements by DNR, as the responsible regulatory agency, and EPA, which "retains supervisory authority" *Flambeau*, 727 F.3d at 703, cannot support a fair notice/due process defense. (Dkt. 34, pp. 46-51). They state that the DNR's position reflected in multiple documents over many decades stating that cranberry marshes are not point sources are "urban legend," whatever that means. (Dkt. 34, p. 51). Plaintiffs' contentions are groundless both as a matter of fact and law.

Plaintiffs try to distinguish *Howmet Corp. v. EPA,* 614 F.3d 544 (D.C. Cir. 2010) quoted by the Seventh Circuit in *Flambeau*, 727 F.3d at 708, as looking to "public statements issued by the agency" in analyzing fair notice. (Dkt. 34, pp. 50-51). However, the *General Electric* case quoted in *Flambeau* also refers to "statements" about what the agency expects. *Flambeau*, 727 F.3d at 708

Plaintiffs also rely heavily on *County of Maui* as alleged support for their argument. (Dkt. 34, pp. 46-50). However, the majority opinion in *County of Maui* did not address fair notice or due process at all. Plaintiffs do not reference any statements by the regulatory agency in that case, the Hawaii Department of Health. "Fair notice" was only mentioned in passing in Justice Alito's dissent, and the facts were that the agency had been silent about the discharges to groundwater without a discharge permit, rather than making affirmative statements.

The facts in this case are much different. DNR made consistent, express statements that

---

[3] Plaintiffs contend that Defendant makes a "hyperbolic argument" that civil penalties of $66,712 per day for each of the 41 alleged days of violation would be a crushing burden. (Dkt. 34, p. 49). Plaintiffs try to portray the concern as an unrealistic exaggeration of what they are seeking. To the contrary, it is exactly the penalty that Plaintiffs have expressly asked this Court to impose. (Dkt. 32 (Am. Compl.), p. 25).

no WPDES permit is required because the Zawistowski marshes are not point sources. (Dkt. 26, pp. 5-8, 17-18). Further, in 2004, the State of Wisconsin and 14 lake property owners sued William Zawistowski, the now deceased husband of Defendant Rosalind Zawistowski, alleging that the marshes created a nuisance. That case is referenced by Plaintiffs as the "2006 public nuisance case." (Dkt. 34, pp. 11-12). The case was tried to the court in 2005 and the circuit court held that the State and property owners failed to prove a nuisance. (Dkt. 38, p. 83). The decision was affirmed by a unanimous Court of Appeals. *State v. Zawistowski*, No. 2006-AP-1539, 2008 WL 302382 (Ct. App. Feb. 5, 2008) (unpublished). The 2004 case is discussed elsewhere in this brief. One particular aspect of it is pertinent to the fair notice/due process issue.

In their brief to the Court of Appeals in *Zawistowski*, the State of Wisconsin and the property owners stated that Zawistowski was not required to have a WPDES permit because releases from the marshes were exempt as agricultural return flows:

> **State and federal water pollution control laws essentially exempt "agricultural return flows" from the requirement that those discharging pollutants to federal/state waters do so pursuant to a permit issued by the appropriate federal/state water pollution control agency.** Thus, Zawistowski's claims that his operations comport with all applicable laws are disingenuous, at best. Neither the Wisconsin Department of Natural Resources nor the U.S. Environmental Protection Agency has required that cranberry growers obtain NPDES/WPDES permits for their discharges to surface waters. Since the regulatory agencies in a position to regulate Zawistowski's pollutant discharges have not asserted jurisdiction, **there effectively *are* no applicable statutes for him to comply with or violate.**

(Brief of State of Wisconsin, *State v. Zawistowski*, 2006 WL 6622023, at *21) (bold emphasis added – italics in original, footnotes omitted). Plaintiffs also argue that statements by regulatory authorities have "no bearing" on the issue unless made "on a full factual record in an adversarial setting." (Dkt. 34, p. 34). While that position is far too narrow, the above quoted statement was made on a full record in an adversarial setting. Further, the Court of Appeals accepted the State's conclusion:

11

> [T]he State argues the court's decision is based on unfounded reservations about acting in the absence of clearly established statutory or common law standard. **The State points out that** a nuisance can exist even though a practice is lawful, and in any event **no statute governs cranberry growers' discharges**. *See Krueger*, 112 Wis.2d at 103, 332 N.W.2d 733 (nuisance may exist even though offending use is lawful); see also 33 U.S.C. § 1362 (2006) (**point source pollution does not include "return flows from irrigated agriculture"**); WIS. STAT. § 283.11(2) (Wisconsin restrictions on most water pollution not to exceed federal restrictions).

*Zawistowski*, No. 2006-AP-1539, 2008 WL 302382, ¶ 19, *4 (emphasis added). Thus, the State of Wisconsin and the lake property owners said directly and expressly that no discharge permit was required by William Zawistowski for the same marshes that are at issue in this case. The Court of Appeals accepted that position in affirming the circuit court's decision.

This provides context for subsequent statements by DNR. These same Plaintiffs sued DNR and the Natural Resources Board in 2016, including a claim that the Zawistowski marshes should be declared to be point sources. (Heilman Dec., p. 2, ¶ 10, Ex. G (Petition for Review, pp. 13-14, ¶ 42). The DNR and Natural Resources Board denied those allegations (Heilman Dec., p. 3, ¶ 11, Ex. H (Statement of Position of DNR, p. 8, ¶ 42). When DNR subsequently prepared a Scope Statement as part of the required rulemaking process for enacting site-specific criteria, it reiterated that the Zawistowski marshes and other cranberry marshes elsewhere on the Lake are not point sources (Heilman Dec., p. 3, ¶ 14, Ex. K (Statement of Scope, p. 2). In the Fiscal Impact Statement, DNR reiterated once again that there are no point sources on the Lake or Bay. (Heilman Dec., p. 3, ¶ 16, Ex. M (Fiscal Estimate & Economic Impact Analysis, p. 2). These were not gratuitous or side comments. They were made as part of DNR's official rulemaking actions.[4]

---

4. Plaintiffs state that "considering that Wisconsin's statute was not amended to exempt 'return flows from irrigated agriculture' from permitting until 2017…it begs the question of what, exactly, the DNR was relying on in state law for its interpretation that cranberry marsh discharges were not point sources prior to that year." (Dkt. 34, pp. 36-37). The answer is that, because Wisconsin law can be no more stringent than federal standards regarding point source discharges, Wis. Stat. § 283.11(2), DNR was

12

Unlike the regulatory agency in *County of Maui*, DNR did not silently acquiesce in the Defendant's operation without a discharge permit. Rather, DNR expressly and repeatedly stated that no permit was needed because the marshes are not point sources. That remains DNR's position today. There was no reason for William or Rosalind Zawistowski to believe that a WPDES permit was required and every reason for them to believe it was not. What Plaintiffs are seeking goes to the heart of the fair notice doctrine.

## III. PLAINTIFFS' CONTENTIONS ABOUT THE 2004 LITIGATION ARE UNTRUE.

In the last section of Plaintiffs' brief, they contend that the lake property owners "technically lost" the 2004 nuisance case "because the circuit court believed there must be 100 percent loss of use and enjoyment of Musky Bay to establish a public nuisance." (Dkt. 34, p. 52). That assertion is false. The plaintiffs in the 2004 case, lake property owners and the State, made that very argument to the Wisconsin Court of Appeals in an effort to get the circuit court judgment reversed. The Court of Appeals unanimously rejected the argument:

> First, the State argues the court applied an incorrect standard by basing its decision on the seasonal nature of the algae and aquatic plant growth in Musky Bay. The State suggests the court's decision reflects a belief that "the nuisance conditions must be constant, 365 days a year, to be actionable."
>
> This argument misreads the court's decision. We have no quarrel with the State's position that a nuisance need not be constant to be actionable. However, the circuit court did not impose any such requirement.

*Zawistowski*, No. 2006-AP-1539, 2008 WL 302382, ¶¶ 11-12, *3. The Court also said: "While the State produced abundant evidence that Musky Bay was changing – evidence the circuit court found convincing – it failed to prove the change resulted in significant interference with recreation or the bay's ecology." *Id.* at ¶ 21, *5. Thus, the argument that Plaintiffs are now making to this Court was presented to the Court of Appeals, which rejected it.

---

interpreting the federal statute. The 2017 amendment simply aligned the Wisconsin definition with the federal definition of "point source."

The Court of Appeals also said that the circuit "court found the interference with recreational uses and the bay's ecology was limited" and "concluded this did not amount to an 'unreasonable interference,' and therefore the State had failed to prove a nuisance." *Id.* at ¶¶ 6-7, *1-2. The Court of Appeals further stated that the circuit court made "an unambiguous finding that the State did not prove a nuisance." *Id.* at ¶ 7, fn 4. The State and the property owners petitioned the Supreme Court to review the decision, but the petition was denied. *State v. Zawistowski*, No. 2006AP001539, 2008 WI 115, 310 Wis. 2d 706, 754 N.W.2d 849.

The simple truth is that the plaintiffs in the 2004 case failed to prove a nuisance, after a full trial.[5] Since the trial, a tail water recovery system was installed at the east marsh, which Plaintiffs acknowledged was an improvement. (Dkt. 35, p. 6, ¶¶ 24-25). Plaintiffs' reference to the 2004 case as somehow justifying their current case is entirely groundless.

Plaintiffs have submitted multiple declarations with reports about the condition of the Bay and/or the discharges from the Zawistowski marshes. They apparently want to retry in this court the case that was lost in 2005. Those declarations are entirely irrelevant to the pending motion.

The due process issue in this case is whether Defendant had fair notice from DNR that she needs or needed a WPDES permit. Given the consistent and repeated statements that the marshes are not point sources, the answer is indisputably that she did not.

---

[5] The same lake property owners had sued William Zawistowski in 2002 in federal court. That case was dismissed in 2003 because plaintiffs had not shown the requisites for diversity jurisdiction. The court stated the loss of use claims were "dubious" because "plaintiffs proposed findings of fact indicate that Musky Bay was eutrophic before 1940." *LeVake v. Zawistowski*, 2003 WL 23200367, *5 (W.D. Wis. October 10, 2003). A eutrophic lake typically has a musky bottom and abundant plant growth. *Maple Leaf Farms, Inc. v. State, Dep't of Nat. Resources*, 2001 WI App. 170, 247 Wis. 2d 96, 633 N.W.2d 720.

## IV. PLAINTIFFS HAVE NOT DISPUTED THE INABILITY OF DEFENDANT TO OBTAIN A WPDES PERMIT.

Finally, as explained in Defendant's opening brief, Defendant had no ability to obtain a WPDES permit because DNR does not issue such permits to cranberry marshes. (*See* Dkt. 26, p. 26). Both DNR and EPA have stated that they are prohibited by Congress from requiring discharge permits for cranberry marshes. (EPA Memo from Robert E. Fabricant, p. 5; Heilman Dec., p. 2, ¶ 5, Ex. B (Letter from C.D. Besadny, Sept. 15, 1989, p. 1). None of the cranberry marshes in Wisconsin have a WPDES permit (DPFOF, Dkt. 27, p. 4, ¶¶ 33) and, in light of EPA's statements, it is safe to assume that no cranberry marsh nationally has an NPDES permit. DNR has explained that it does not regulate cranberry marshes through WPDES permits and does not have a program to do so.

Plaintiffs seek an injunction requiring Defendant to obtain a WPDES permit (Dkt. 32, p. 25), but have not explained how she can do that. Perhaps they assume that if this Court enters such an injunction, DNR will feel compelled to create a permit program for every cranberry marsh in the state, despite not being a party to this case. However, part of the intent of Congress in enacting the return flows exception/exemption was "to alleviate EPA's burden in having to issue permits for every agricultural point source." *Glaser,* 945 F.3d at 1084, *see, also*, EPA Memo from Robert E. Fabricant, fn 3:

> Congress also recognized **the significant burden on EPA and the States** associated with issuing permits for all irrigation return flows. For instance, House debate on the legislation indicated that, "The problems of permitting every discrete source or conduit returning water to the streams from irrigated lands is simply too burdensome to place on the resources of EPA."

(emphasis added).

If Plaintiffs truly believed that DNR is not following the law, they could have pursued the

claim they filed against DNR in 2016 seeking such a declaration.[6] Their choice to drop that claim and instead sue Defendant is unfair and unworkable.

## **CONCLUSION**

Plaintiffs have provided no credible argument in support of their contention that Defendant's marshes require a WPDES permit. On top of that, they have offered no evidence that Rosalind Zawistowski had fair notice of such an imagined permit requirement. Plaintiffs' lawsuit is entirely groundless and unfair.

Defendant's motion for summary judgment should be granted.

Dated this 15th day of July, 2024.

**DeWitt LLP**

By: */s/ Ronald R. Ragatz*
Ronald R. Ragatz (#1017501)
J. Wesley Webendorfer (#1090106)
25 W. Main Street, Suite 800
Madison, WI 53703
T: (608) 255-8891
E: rrr@dewittllp.com; jww@dewittllp.com

***Attorneys for Defendant Rosalind C. Zawistowski, as Trustee of the Zawistowski Joint Revocable Trust***

---

[6] Plaintiffs claim to have "limited resources" as a reason for pursuing this case instead of their declaratory judgment claim against DNR. (Dkt. 34, p. 54). COLA says it represents 650 lake property owners, (Dkt. 34, p. 7), and the Tribe is a sovereign nation. They have chosen to sue Rosalind Zawistowski, the widow of a family farmer. Property owners on Lac Courte Oreilles and Musky Bay have spent over 20 years pursuing groundless litigation against this family farm. Their cry of "limited resources" is not credible.