IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

COURTE OREILLES LAKES ASSOCIATION INC, and
LAC COURTE OREILLES BAND OF THE LAKE
SUPERIOR CHIPPEWA,

|  |  |  |
|---|---|---|
| | Plaintiffs, | OPINION and ORDER |
| v. | | |
| | | 24-cv-128-jdp |

ROSALIND C. ZAWISTOWSKI, as trustee of the
Zawistowski Joint Revocable Trust,

Defendant.

---

This case brought under the Clean Water Act (CWA) is about the discharge of phosphorus into Lac Courte Oreilles, a lake in northern Wisconsin. Defendant Zawistowski Joint Revocable Trust owns two cranberry marshes next to the lake. The plaintiffs are a property-owners association devoted to protecting the lake and a tribe that has treaty rights over the lake. Plaintiffs contend that the trust is violating the CWA by discharging phosphorus into the lake without a permit.

Both sides move for summary judgment. The trust does not dispute that it is discharging phosphorus into the lake without a permit. The question is whether the permit requirement applies to the trust's conduct.

Both the Wisconsin Department of Natural Resources (DNR) and the Environmental Protection Agency (EPA) have concluded that the permitting requirement does not apply to cranberry farms under an exclusion in the CWA for "return flows from irrigated agriculture," and they have rejected plaintiffs' calls to apply the permitting requirement to the trust. The agencies' understanding of the exclusion is consistent with both the plain language of the statute and legislative history.

Plaintiffs' primary argument in support of a contrary view is that including cranberry farms in the exclusion for "irrigated agriculture" creates a "massive loophole" in the CWA, which is contrary to the CWA's purpose to protect the nation's navigable waters. Regardless of whether that is correct, the "loophole" is one that Congress inserted, so the court cannot disregard it. Plaintiffs have identified no basis for limiting the scope of the exclusion in the way they suggest. The court will grant the trust's motion for summary judgment and deny plaintiffs' motion.

## BACKGROUND

The Courte Oreilles Lakes Association represents approximately 650 property owners on and surrounding Lac Courte Oreilles and Little Lac Courte Oreilles. The association's mission statement sets forth two purposes:

> (1) to protect, preserve and enhance the quality of the Courte Oreilles Lakes, their shorelands and surrounding areas, while respecting the interests of property owners and the rights of the general public, and (2) to consider, study, survey and respond to issues deemed relevant by the membership of the organization.

Dkt. 81, ¶ 2.

Lac Courte Oreilles Band of the Lake Superior Chippewa is one of six bands of the Lake Superior Chippewa Indians. Approximately one third of Lac Courte Oreilles lies within the tribe's reservation. The tribe has treaty rights over the rest of the lake, including fishing rights.

Zawistowski Joint Revocable Trust owns two cranberry marshes on Musky Bay, which is part of Lac Courte Oreilles.[1] The east marsh has 20 acres of production, with a typical yield of 4,000 barrels of cranberries, and the west marsh has 60 acres of production, with a typical yield of 8,000 barrels. The bay and the marshes are shown in the aerial photograph below:



The trust fertilizes its cranberry beds with a combination of phosphorus, nitrogen, and potassium.

---

[1] The trust says that a different entity, W.D.Z. Cranberries, runs the cranberry farm. But the trust does not challenge plaintiffs' claim on the ground that it is the wrong defendant or that W.D.Z. should be joined, so the court does not consider that issue.

In the fall each year, the trust floods the cranberry marshes with water from the lake to harvest the cranberries. In the winter, the marshes are flooded with lake water to protect plants from dying. Lake water is also used for plant growth, for pest control, as a herbicide, and to protect plants from frost. Water that is used for these purposes is returned to the lake through man-made channels that connect the marshes to the lake.

From 2019 to 2024, plaintiffs took water samples at the outlets for the east and west marshes. These samples show phosphorus concentrations between 27 parts per billion (ppb) and 470 ppb. The DNR has established a criterion of 10 ppb for phosphorus in the lake. Wis. Admin. Code § NR 102.06(7)(b)4. The phosphorus concentrations at the marsh outlets are on average eight to ten times higher than the concentrations in other parts of the lake.

The trust does not have a permit for discharging phosphorus into the lake. In 1989, the DNR determined that the trust's cranberry farm in particular and cranberry farms in general did not need a permit to comply with the CWA. In 2019 and 2023, the DNR again stated its view that the CWA does not allow the DNR to require permits for water pollution caused by cranberry marshes. In response to an inquiry from the tribe, an EPA official stated in 2013 that "EPA had concluded that discharges from cranberry bogs into waters of the United States are irrigation return flows not subject to [CWA] permitting requirements." Dkt. 30-6.

The court will discuss other facts as they become relevant to the analysis.

ANALYSIS

## A.  Standing

All plaintiffs in federal court must show that they have standing to sue. The trust does not challenge plaintiffs' standing, but, as plaintiffs recognize, the court has an independent

obligation to confirm that it has subject matter jurisdiction, and that includes the plaintiffs' standing. *See Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1012 (7th Cir. 2021). This is especially true when, as in this case, the plaintiffs are challenging government regulation of a third party rather than themselves, so the connection between the plaintiffs and the challenged conduct is more attenuated. *See Food and Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 382–85 (2024). Plaintiffs must show three things to establish standing: (1) a concrete injury; (2) causation; and (3) redressability. *Id.* at 380.

### 1. Association

The court will consider the association's standing first. The association says that it has standing in two ways. First, it says it is harmed directly because one of its primary purposes is to "protect, preserve, and enhance the quality" of the lakes, and it has spent more than $100,000 to both reduce the weeds and restock the muskie population. Dkt. 81, ¶¶ 2, 107–08. Second, it says that it is harmed through its members, who are property owners around the lake. It cites declarations of members who say that they cannot go boating in some areas of the lake because of the weeds, and they are catching fewer and smaller muskie. The court concludes that the association has established standing under the first theory, so it is unnecessary to consider the second.

The following facts are undisputed: phosphorus is in the fertilizer that the trust uses on its cranberry farm, Dkt. 81, ¶¶ 19, 22–24; some of the fertilizer is discharged into the lake, *id.*, ¶ 37; the lake has elevated concentrations of phosphorus, especially around the trust's marshes, *id.*, ¶¶ 50–60; increased concentration of phosphorus leads to the growth of more algae and other aquatic invasive species, *id.*, ¶ 69; algae consumes oxygen, which reduces the amount of oxygen in the water, which, in turn, leads to the death of fish and fish larvae, *id.*

¶¶ 70–71, 73–75; the association has spent more than $100,000 to kill and remove aquatic invasive species and to restock the lake with muskie fish, *id.*, ¶¶ 107–08.

These undisputed facts are enough to show that the association has standing. Spending time and money to mitigate harm can qualify as a concrete injury. *See Remijas v. Neiman Marcus Grp., LLC,* 794 F.3d 688, 694 (7th Cir. 2015); *Crawford v. Marion County Election Board*, 472 F.3d 949, 951 (7th Cir. 2007). This is not a situation like *Alliance for Hippocratic Medicine* in which the organization tried to "manufacture its own standing" by devoting resources to opposing a regulation it disliked. 602 U.S. at 393–95. Rather, the purposes of the association are to protect the lake and the interests of the property owners who live around the lake. The Court recognized in *Alliance for Hippocratic Medicine* that an organization has standing when the defendant's conduct "directly affect[s] and interfere[s] with [the organization's] core business activities." *Id.* at 395. The association's injury in this case fits comfortably within that view.

As for causation, "the plaintiff must show a predictable chain of events leading from the [defendant's conduct] to the asserted injury—in other words, that the [defendant's] action has caused or likely will cause injury in fact to the plaintiff." *Id.* at 382. As already noted, it is undisputed that the trust discharges phosphorus into the lake and that increased phosphorus can cause the problems that the association is trying to ameliorate. So it is reasonable to infer causation.

As for redressability, if the association prevailed in this lawsuit, the trust would have to obtain a permit, and the permit would require the trust to keep phosphorus levels at 10 ppb or lower; if it failed to do that, it would be subject to civil penalties. 33 U.S.C. § 1344(s)(4); Wis. Admin. Code § NR 102.06(7)(b)4. So it is reasonable to infer that phosphorus levels would go down, and the problems the association is opposing would be reduced if the association were

to succeed. *See Lower Susquehanna Riverkeeper v. Keystone Protein Company*, 520 F.Supp.3d 625, 632–33 (M.D. Pa. 2021).

### 2. Tribe

It is a closer call whether the tribe has demonstrated standing. Plaintiffs devote less than a page of their brief to that issue, contending that the tribe has standing because it has treaty rights over the lake. Plaintiffs do not cite a particular treaty provision; instead they cite generally to the tribe's rights to hunt, fish, and gather animal life and vegetation in the ceded territories, which includes the lake. *See Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wis.*, 707 F. Supp. 1034, 1037 (W.D. Wis. 1989); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wis.*, 653 F. Supp. 1420, 1426–27 (W.D. Wis. 1987). Plaintiffs also cite the declaration of the tribe's director for the Tribal Conservation Department, who says that members of the tribe "harvest fish, hunt waterfowl, trap, and gather aquatic medicines from this lake." Dkt. 42, ¶ 4. Plaintiffs do not explain how increased phosphorus in the lake has affected any specific member's ability to exercise treaty rights. But it is reasonable to infer that the increased phosphorus leads to fewer fish in the lake, and fewer fish impairs the tribe treaty rights because it makes harvesting fish more difficult and less productive.

In any event, the relief obtained in this lawsuit would be the same regardless of whether one or both plaintiffs are in the case. "Where at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not." *Ezell v. City of Chicago,* 651 F.3d 684, 696 (7th Cir. 2011). So the court will proceed to the merits.

**B. Merits**

The CWA regulates the discharge of pollutants into navigable waters, and it creates a cause of action for any person who is adversely affected to sue for violations and seek enforcement of the law and civil penalties. 33 U.S.C. § 1311 and § 1365. A plaintiff establishes a violation of the CWA by proving that the defendant added a pollutant from a point source into navigable waters of the United States without a permit. *Wisconsin Resources Protection Council, Center for Biological Diversity v. Flambeau Min. Co.*, 903 F. Supp. 2d 690, 710 (W.D. Wis. 2012).

Both sides move for summary judgment, but the trust discusses only one element in its briefs, which is whether its discharges come from a "point source." That element is dispositive, so it is not necessary to consider the other elements. It is also unnecessary to consider the trust's alternative argument that requiring it to get a permit would violate the Due Process Clause.

"Point source" is defined as follows in the CWA:

> The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

33 U.S.C. § 1362(14). The trust does not dispute that the man-made channels connecting its marshes to the lake meet the definition of "point source" described in the first sentence of § 1362(14). But the trust says that it satisfies the exclusion described in the second sentence because its discharges are part of "return flows from irrigated agriculture." It also relies on similar language in a different part of the CWA: "The Administrator shall not require a permit

under this section for discharges composed entirely of return flows from irrigated agriculture, nor shall the Administrator directly or indirectly, require any State to require such a permit." 33 U.S.C. § 1342(l)(1).

The dispute between the parties is narrow. They agree that all of the trust's phosphorus discharges come from water that the trust pulled from the lake, used on the cranberry crops for reasons related to crop production, and then returned to the lake. *See* Dkt. 56, ¶¶ 21–22. In other words, it is undisputed that the trust's phosphorus discharges are composed entirely of return flows from the trust's agriculture. The dispute is whether all of the return flows come from "irrigated" agriculture. The trust says that all of the water drawn from the lake is used for crop production, so it qualifies as irrigation. Plaintiffs' position is less clear, but the court understands it to be that the use of lake water does not qualify as irrigation unless the trust is using that water solely as a substitute for rainfall or to help its crops grow, so uses such as flooding the crops for harvesting and frost protection and spraying the crops with water as part of pest control or as a herbicide do not qualify.[2]

The statutory provisions at issue do not define "irrigated agriculture." But, as the trust points out, the ordinary meaning of "irrigate" is "to supply (as land or crops) with water by

---

[2] Plaintiffs rely on *Pacific Coast Federation of Fishermen's Associations v. Glaser*, 945 F.3d 1076, 1083 (9th Cir. 2019), for the proposition that § 1362(14) and § 1342(l)(1) are "exceptions" or "exemptions" to the permit requirement, so the trust has the burden to show that they apply. It is not necessary to determine in this case which party has the burden of proof because all the relevant facts are undisputed; the dispute is a legal one about the proper interpretation of § 1362(14) and § 1342(l)(1).

artificial means." Dkt. 26, at 11 (citing Webster's Third New Int'l Dictionary 1196 (2002)).[3] All of the trust's uses of lake water involve supplying water to crops by artificial means, so they all meet this plain language meaning of "irrigate." This understanding of "irrigated agriculture" is consistent with *Pacific Coast Federation of Fishermen's Associations v. Glaser*, which concluded that the term "irrigated agriculture" should be "defined broadly" and includes "discharges from all activities related to crop production." 945 F.3d 1076, 1084–85 (9th Cir. 2019). It is also consistent with the views of the DNR and the EPA, which have repeatedly stated that cranberry farms do not require permits for discharging pollutants into navigable waters.[4] Plaintiffs cite no case law adopting a narrower interpretation, and they do not otherwise contend that the ordinary meaning of "irrigated" is limited to using water as a substitute for rainfall.[5]

Plaintiffs do raise several arguments why they believe that § 1362(14) and § 1342(l)(1) does not apply to the trust's phosphorus discharges, at least not all of them. The arguments

---

[3] *See also Irrigate*, Collins Unabridged Dictionary, https://www.collinsdictionary.com /us/dictionary/english/irrigate ("to supply (land) with water by means of ditches or artificial channels or by sprinklers"); *Irrigate*, Dictionary.com, https://www.dictionary.com/ browse/irrigate ("to supply (land) with water by artificial means, as by diverting streams, flooding, or spraying"); *Irrigate*, The American Heritage Dictionary of the English Language (5th ed. 2018) ("To supply (land or crops) with water by means of pipes, sprinklers, ditches, or streams.").

[4] As plaintiffs point out, agency opinions are not entitled to judicial deference. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). But even without such deference, the court concludes that the DNR and EPA reached the correct result.

[5] Some dictionaries do include narrower definitions of "irrigate." For example, one definition in New Oxford American Dictionary (3d. ed. 2010) states: "supply water to (land or crops) to help growth, typically by means of channels." But the same dictionary also includes a more general definition: "supply (land) with water." *Id*. Plaintiffs identify no examples of dictionaries in which "irrigate" is defined to mean only using water to promote growth.

can be divided into three categories: text, legislative history, and statutory purpose. The court will devote the remainder of the opinion to addressing these arguments.

**Text.** Plaintiffs make two arguments about the text of the CWA and a related environmental statute. The first is that the two sentences in 33 U.S.C. § 1362(14) should be harmonized so that discharges cannot qualify as "return flows from irrigated agriculture" in the second sentence if they meet the definition of "point source" in the first sentence. In other words, plaintiffs say that a discharge in an agricultural return flow is a point source if the farmer uses a conveyance such as a channel or ditch to return the water.

Accepting plaintiffs' contention would render the second sentence of § 1362(14) superfluous. There would be no need for the exclusion if the definition in the first sentence resolved all questions about what qualifies as a "point source." The second sentence states that the "term [point source] *does not include* . . . return flows from irrigated agriculture." 33 U.S.C. § 1362(14) (emphasis added). This is a clear instruction from Congress that return flows from irrigated agriculture may not be classified as a point source, regardless of whether they would otherwise meet the criteria in the definition.

To support their argument, plaintiffs cite three cases for the proposition that courts have declined to apply the exclusion for "agricultural stormwater" in § 1362(14) when the stormwater runoff "is discharged from pipes, ditches, channels, and other point sources." Dkt. 34, at 28. But this is a mischaracterization of the cited cases, none of which involve an

interpretation of the term "agricultural stormwater" or the second sentence in § 1362(14).[6] In any event, even if § 1362(14) could be interpreted as plaintiffs suggest, it would not affect the interpretation of § 1342(l)(1), which is not contingent on the meaning of "point source." Rather, that provision creates an exception for "discharges composed entirely of return flows from irrigated agriculture," regardless of whether the discharges come from a point source.

Plaintiffs also rely on a different statute to support their interpretation of § 1362(14) and § 1342(l)(1). Specifically, plaintiffs cite the Resource Conservation and Recovery Act (RCRA), which states that "solid waste . . . does not include . . . solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of Title 33." 42 U.S.C. § 6903(27). Plaintiffs say that this language "indicates Congress's understanding that not all irrigation return flows are excepted from" CWA permit requirements. Dkt. 34, at 32.

Plaintiffs' argument appears to be based on a view that the reference to "point sources subject to permits" is paired with "irrigation return flows," suggesting that some irrigation return flows are "subject to permits." But that is not the only way to read the statute. Rather, the RCRA may be excluding (1) "irrigation return flows" and (2) "industrial discharges which are point sources subject to permits." That would make sense because industrial discharges *can* qualify as point sources, unlike agricultural return flows. In any event, it is not reasonable to

---

[6] *See Olympic Forest Coalition v. Coast Seafoods Company*, 884 F.3d 901, 907 (9th Cir. 2018) (considering when a "concentrated animal feeding operation" qualifies as a point source); *Northwest Environmental Defense Center v. Brown*, 640 F.3d 1063, 1066–67 (9th Cir. 2011) (considering when "stormwater. . . runoff that flows from logging roads" requires a permit); *North Carolina Shellfish Growers Ass'n v. Holly Ridge Associates, LLC*, 278 F. Supp. 2d 654, 681 (E.D.N.C. 2003) (considering scope of exemption for "non-point source silvicultural activities").

infer that Congress intended to make agricultural return flows subject to permitting under the CWA based on a provision that exempts irrigation return flows from regulation under the RCRA. If anything, § 6903(27) only confirms that Congress saw irrigated agriculture as a special category that should be exempt from a range of regulations that would otherwise apply.

**Legislative history.** Plaintiffs make two arguments about legislative history. First, they say that a proposed regulation that preceded § 1362(14) and § 1342(l)(1) is evidence that "return flows from irrigated culture" do not encompass discharges from cranberry farms. Second, they say that a senator's statement in the congressional record supports a narrow interpretation of § 1362(14) and § 1342(l)(1).

As an initial matter, a court may consider congressional intent only if a statute is ambiguous. *Holder v. Hall*, 512 U.S. 874, 932 n. 28 (1994); *Mertens v. Hewitt Associates*, 508 U.S. 248, 261 (1993). Plaintiffs have not identified any statutory ambiguity in this case, so plaintiffs' reliance on legislative history necessarily fails. Regardless, the legislative history of § 1362(14) and § 1342(l)(1) does not support plaintiffs' position.

Plaintiffs cite a proposed EPA regulation that would have required permits when "irrigation return flow is discharged into navigable waters." Dkt. 34, at 25 (citing 41 Fed. Reg. 28,493-28,496 (July 12, 1976)). In a comment to the proposed regulation, the EPA stated that the phrase "irrigation return flow" includes "water used for cranberry harvesting, rice crops, and other such controlled application of water to land for purposes of farm management." *Id.* The regulation never went into effect because Congress enacted the "irrigated agriculture" exclusion in § 1362(14) and § 1342(l)(1), but plaintiffs say it is noteworthy that Congress "did not explicitly include cranberry harvesting" in the exclusion. *Id.* The Court understands plaintiffs to contend that § 1362(14) and § 1342(l)(1) are based on the proposed regulation,

so it is reasonable to infer that Congress would have included an express reference to cranberry farms in § 1362(14) and § 1342(l)(1) if it had intended to include those farms in the exclusion.

Plaintiffs cite no authority for the view that courts should construe a statute in light of a proposed regulation that never went into effect. Even if there might be some situations in which it would make sense to do that, the EPA's proposed regulation does not support plaintiffs' narrow interpretation of § 1362(14) and § 1342(l)(1), for multiple reasons. First, the regulation required farmers to get permits for discharges in return flows; the statute excludes return flows from the permit requirement. It is not reasonable to interpret the scope of a statutory exclusion in light of a regulation that had the opposite purpose.

Second, the language plaintiffs cite about cranberry farms was not in the regulation, but only in a comment to the regulation, so there is no reason the language would have been included in § 1362(14) and § 1342(l)(1), even if those provisions were based on the regulation. The actual definition of "irrigation return flows" in the proposed regulation was "conveyances carrying surface irrigation return as a result of the controlled application of water by any person to land used primarily for crops." Under that definition, the key question is whether the water is used "for crops," so it is broad enough to include all the water uses at issue in this case.

Third, § 1362(14) and § 1342(l)(1) do not identify *any* specific examples of things that qualify as "irrigated agriculture," so it is not reasonable to infer that the failure to single out cranberry farms evinces an intent to exclude cranberry farms from those provisions. As already discussed, the plain language of § 1362(14) and § 1342(l)(1) is broad enough to encompass cranberry farms and all of the trust's return flows.

Plaintiffs also cite a statement from a senator that the "irrigated agriculture" exclusion "corrects what has been a discrimination against irrigated agriculture. . . . Farmers in areas of

14

the country which were blessed with adequate rainfall were not subject to permit requirements on their rainwater run-off, which in effect . . . contained the same pollutants." Dkt. 34, at 26 (quoting 123 Cong. Rec. 39,210 (Dec. 15, 1977) (statement of Sen. Wallop)). The court understands plaintiffs to contend that the senator's statement is evidence that the "irrigated agriculture" exclusion is limited to using water to supplement rainfall.[7]

"[I]ndividual legislators' statements are of minimal value when it comes to interpreting statutes." *Lott v. Pfizer, Inc.*, 492 F.3d 789, 794 (7th Cir. 2007). But even if it is true that at least part of the purpose of the "irrigated agriculture" exclusion was to prevent discriminatory treatment against farmers who are not "blessed with adequate rainfall," this does not mean that was the only purpose or that Congress intended to give "irrigated agriculture" an artificially narrow meaning. It makes sense that members of Congress would be concerned with using irrigation to supplement rainfall because that is the primary purpose of irrigation. But plaintiffs point to no legislative statements suggesting that other uses of water were meant to be excluded.

The Ninth Circuit observed in *Glaser* that the "irrigated agriculture" exclusion had multiple purposes, including "to alleviate EPA's burden in having to issue permits for every agricultural point source." 945 F.3d at 1084. A Senate Report suggested a different purpose, stating that "divid[ing] agriculture into point and nonpoint sources is effective with regard to feedlots, but ineffective with regard to irrigation return flows." S. Rep. No. 95-370, at 9; *see also id.* at 35 ("[E]ffluent limits based on technological methods may not be appropriate for

---

[7] *Glaser* noted a similar statement by another senator: "This amendment promotes equity of treatment among farmers who depend on rainfall to irrigate their crops and those who depend on surface irrigation which is returned to a stream in discreet conveyances." 945 F.3d at 1084–85 (quoting 123 Cong. Rec. 26,702 (Aug. 4, 1977) (statement of Sen. Stafford)). But in *Glaser*, the court concluded that the senator's statements supported an interpretation of § 1342(l)(1) so that it applies to all return flows related to crop production. *Id.*

control of return flow pollutants."). So helping farmers in arid climates was not the sole aim of the exclusion.

Three other portions of the Senate Report point toward a broader view of the "irrigated agriculture" exclusion. First, the report notes that "return flows from irrigated agriculture . . . have been defined by the Environmental Protection Agency as conveyances carrying surface irrigation return as a result of the controlled application of water by any person to land used primarily for crops." S. Rep. 95-370, at 35. This definition is consistent with the ordinary meaning of "irrigate" cited by the trust, and it suggests that virtually any use of water for crops is covered by the "irrigated agriculture" exclusion. So it would be broad enough to include all of the trust's uses of water at issue in this case. Plaintiffs point to nothing in the legislative history suggesting that Congress rejected the EPA's definition of "irrigated agriculture."

Second, the report states that return flows from irrigated agriculture "are more appropriately treated under the requirements" in the CWA for nonpoint sources "regardless of the manner in which the flow was applied to the agricultural lands." *Id.* This suggests that there is no distinction under the statute between spraying with water to promote growth and flooding to assist with harvesting. The manner in which water is applied is irrelevant.

Third, the report states that the word "entirely" in § 1342(l)(1) "was intended to limit the exception to only those flows which do not contain additional discharges from activities unrelated to crop production." *Id.* That is not a definition of "irrigated agriculture," but it supports the conclusion that the key question is whether the farmer is using water for "crop production" in some way; it is not limited to water used to help crops grow.

16

For these reasons, the court concludes that the legislative history of the "irrigated agriculture" exclusion does not support plaintiffs' interpretation of § 1362(14) and § 1342(l)(1).

**Purpose.** Plaintiffs rely on *County of Maui, Hawaii v. Hawaii Wildlife Fund*, 590 U.S. 165 (2020), to support the contention that the § 1362(14) and § 1342(l)(1) "must be construed consistent with [their] objectives to restore and maintain the Nation's waters." Dkt. 34, at 17. Plaintiffs argue that applying § 1362(14) and § 1342(l)(1) to cranberry farms is inconsistent with that purpose, so the court should read the provisions narrowly. This argument is also unpersuasive.

The question in *County of Maui* was whether pollution that reaches navigable waters only through groundwater pollution is "from" a point source. *Id.* at 172. The plaintiff's view was that "from" means "fairly traceable," and the defendant's view was that it means that no non-point source lies between the point source and the navigable waters. *Id.* at 172–73. The Court rejected both views, concluding that the plaintiff's view would greatly expand the EPA's authority, and it was inconsistent with the structure of the statute, legislative history, and longstanding regulatory practice. *Id.* at 174–78. The Court concluded that the defendant's view was too narrow, in part because it would "create . . . a large and obvious loophole in one of the key regulatory innovations of the Clean Water Act" by allowing landowners to avoid regulation by moving a point source slightly so that "the pollution must travel through at least some groundwater before reaching the sea." *Id.* at 178. The Court also observed that "there is no linguistic basis here to . . . limit" the meaning of "from" as the defendants suggested. *Id.* at 181.

The Court adopted a middle approach, concluding that a permit is required "when there is a direct discharge from a point source into navigable waters or when there is the functional equivalent of a direct discharge." *Id.* at 183.

*County of Maui* does not stand for the proposition that the general purpose of the CWA trumps the text or other tools of statutory construction. It is well established that the court may not consider the purpose of a statute to interpret unambiguous text. *See Greyer v. Illinois Dep't of Corr.*, 933 F.3d 871, 879 (7th Cir. 2019); *Shlahtichman v. 1 800 Contacts, Inc.*, 615 F.3d 794, 802 (7th Cir. 2010). In *County of Maui*, the word "from" had multiple possible meanings, and the Court considered the CWA's "language, structure, and purposes" to interpret the term in context. As already discussed, plaintiffs have not identified any textual ambiguity in this case. Rather, they are asking the court to reject any interpretation of § 1362(14) and § 1342(l)(1) that would not further the CWA's general purpose to "restore and maintain the Nation's waters."

Accepting plaintiffs' view would require the court to disregard § 1362(14) and § 1342(l)(1). By their own terms, those provisions allow farmers to pollute navigable waters under some circumstances, and that cuts against the CWA's general purpose. But laws are often "a complex and fragile balance of compromises," so not every provision points in the same direction. *Schutte v. Ciox Health, LLC*, 28 F.4th 850, 858–59 (7th Cir. 2022). That does not make the law ambiguous, and it does not give the court license to read the exclusion more narrowly than the text allows. *See id.* Regardless of whether it was wise to create an exception for agricultural return flows, it was Congress's decision to make, so this court may not rewrite the statute to make it conform to the general purpose.

18

In sum, plaintiffs' interpretation of § 1362(14) and § 1342(l)(1) is not supported by any of the tools for statutory construction. The interpretation is also unworkable. Plaintiffs do not explain how farmers (or courts) would apply the "irrigated agriculture" exclusion if the court were to adopt their view. They say that "non-irrigation discharges" require a permit, but they do not provide a definition for that term. At one point in their brief, they suggest it means "excess water attributable to watering crops," Dkt. 34, at 29, but that simply shifts the question to what "watering crops" means. If any watering of crops qualifies, then it could include using water as a herbicide or pesticide or for frost protection, uses that plaintiffs contend do not qualify for the exclusion. Even if plaintiffs mean to argue that irrigation means watering crops to promote growth, those other uses could still be covered because virtually any use of water on crops that precedes harvesting could be viewed as an attempt to promote growth.

As previously discussed, the court understands plaintiffs' position to be that only water used as a substitute for rain qualifies as "irrigation," so that flooding crops for harvesting and spraying crops for pest control or frost protection cannot qualify as irrigation. But if that were correct, it would not be clear what would be left of § 1362(14) and § 1342(l)(1). Most farmers do not flood their crops for harvesting, but many farmers use water for frost protection and pest control. Plaintiffs insist that they are only challenging discharges of water used "for non-irrigation purposes," but they do not explain how farmers could feasibly segregate return flows for "irrigation purposes" from return flows for "non-irrigation purposes" under plaintiffs' understanding of those terms. So the result would be that farmers would need a permit for all of their return flows that included pollutants. That may be a desirable result from plaintiffs' perspective, but plaintiffs have identified no basis in the text or legislative history of § 1362(14) and § 1342(l)(1) that Congress intended that result. If Congress had wanted to create a

19

distinction that would be so difficult to define and apply, one would expect that Congress would have made that distinction clear in the text.

The court concludes that the term "irrigated agriculture" in § 1362(14) and § 1342(l)(1) includes all uses of water for crop production, so the trust was not required under the CWA to get a permit for discharging phosphorus into Lac Courte Oreilles. The court will grant the trust's motion for summary judgment.

ORDER

IT IS ORDERED that:

1.  Defendant's motion for summary judgment, Dkt. 25, is GRANTED.

2.  Plaintiffs' motion for summary judgment, Dkt. 63, is DENIED.

3.  The clerk of court is directed to enter judgment in defendant's favor and close this case.

Entered February 7, 2025.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge